J-A10036-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
                           :              PENNSYLVANIA
                           :
            v.                  :
                           :
                           :
DERRICK GOINS                 :
                           :
            Appellant        :     No. 513 EDA 2022

Appeal from the Judgment of Sentence Entered January 13, 2022
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0006411-2019

MEMORANDUM PER CURIAM:                       **FILED JUNE 20, 2023**

Derrick Goins appeals from the January 13, 2022 aggregate judgment of sentence of life imprisonment imposed after a jury found him guilty of first-degree murder and criminal conspiracy to commit murder.[1]  After careful review, we affirm the judgment of sentence.

The factual history of this case was set forth at great length in the trial court's May 13, 2022 opinion and need not be reiterated in full here.  *See* trial court opinion, 5/13/22 at 3-36.  The relevant facts and procedural history of this case were summarized as follows:

> [Appellant's] convictions arose out of a conspiracy with co-defendants, Kyshan Brinkley and Jacquan Lee, to murder Keith Robinson, a rival drug dealer to the home-grown Pottstown gang, Bud Gang Bitch ("BGB").  On March 30, 2019, at about 10:53 p.m.,

---

[1] 18 Pa.C.S.A. §§ 2502(a) and 903(a)(1), respectively.

the victim's vehicle was sprayed with bullets, while the victim was parked at the corner of York and Walnut Streets, Pottstown. Two of the ten bullets hit the victim and killed him. [Appellant] left the scene in a black van with co-defendants Brinkley and Lee, and a few minutes later arrived at the 206 [Manatawny] Street apartment complex.

Specifically[,] as to [Appellant], earlier in the evening of March 30, 2019, [Appellant] was with his co-defendants Brinkley and Lee at a gathering. Several witnesses identified [Appellant] as being present at the Chestnut and Evans Streets gathering location. Witnesses observed [Appellant] leave there with his co[-]defendants and Elijah Davis in a black van. A short time later, a black van was captured twice on surveillance in the vicinity of the victim's car, actually circling the victim's car. A witness who was in the area of the murder scene, just prior to the murder, observed [Appellant] pacing in an alleyway. After the murder, [Appellant] was observed at 206 Manatawny Street apartment complex, the BGB gang trap house, along with his co-defendants. Additionally, [Appellant's] cell phone records from the night of the murder show that the movements of his cell phone were consistent with those of co-defendant Brinkley's cell phone, that put both in the area of the murder at the relevant time, traveling back to 206 Manatawny Street, then a short time later their cell phones traveled to a gas station, and then to the Uncut club in Philadelphia. Surveillance footage corroborates that a black van was at the murder scene, at 206 Manatawny Street, and at a nearby gas station at times that match up to the cell phone records. The surveillance at the gas station depicted [Appellant] exiting the black van. Finally, the evidence showed that [Appellant] had rented a black dodge caravan minivan on March 29, 2019 and returned it April 2, 2019.

*Id.* at 1-2.

Appellant was subsequently arrested in connection with this incident and proceeded to a joint jury trial alongside his co-defendants on January 3, 2022. At trial, Commonwealth presented testimony from 32 witnesses and the defendants presented testimony from an additional 6 witnesses. Following an eight-day jury trial, Appellant was found guilty of first-degree murder and criminal conspiracy to commit murder. On January 13, 2022, the trial court sentenced Appellant to an aggregate term of life imprisonment. Appellant filed timely post-sentence motions that were ultimately denied by the trial court on January 31, 2022.

Thereafter, on February 16, 2022, Appellant filed a timely notice of appeal.[2] On February 17, 2022, the trial court ordered Appellant to file a concise statement of errors complained of on appeal, in accordance with Pa.R.A.P. 1925(b). Appellant filed a timely concise statement on March 2, 2022, and the trial court filed its comprehensive Rule 1925(a) opinion on May 13, 2022.

Appellant raises the following issues for our review:

1.      [Whether the t]rial court made an error of law and abused its discretion in failing to grant Appellant's motion to sever as the Appellant was prejudiced by having his co-defendants tried at the same time when there were several pieces of evidence admitted in front of the jury that would have been inadmissible against the Appellant if he had a separate trial, including but

---

[2] Appellant's co-defendants, Kyshan Brinkley and Jacquan Lee, filed related appeals at No. 549 EDA 2022 and No. 547 EDA 2022, respectively.

- 3 -

not limited to: codefendant's Instagram and social media posts, codefendants' sworn grand jury testimony, codefendant's confession, evidence of co-defendants' prior drug activities, gang activities, and rap videos[?]

In addition, all the specific bad acts evidence only applied to the Appellant's codefendants and resulted in an unfair trial, no matter how many cautionary instructions the court made.

2. [Whether the trial c]ourt made an error of law and abuse of discretion in allowing Lt. Erick Echev[a]rria to testify as a gang expert, when there was no testimony or evidence presented[:] 1) that [Appellant] was in the gang Bud Gang Bitch [("BGB");] 2) that [Appellant] was involved in any gang activity in the last 10 to 15 years[;] and 3) that [Appellant] was involved in any drug activity or had any connection to the "trap" house located at 206 Manatawny[?]

Furthermore, the [trial] court made an error of law and abuse of discretion in failing to give a cautionary instruction as it related to Lt. Erick Echevarria's testimony, and in failing to advise the jury that none of the testimony of said witness could be used against [Appellant].

3. [Whether the trial c]ourt made an error of law and abuse of discretion in allowing Lt. Erick Echeverria to testify as a gang expert witness, as Lt. Erick Echev[a]rria was not able to give any specific information related to the Bud Gang Bitch ("BGB") gang's hierarchy organization structure, or specific acts of the gang or its affiliates, and provided only nonspecific information regarding characteristics of gangs in general[?]

Lt. Erick Echev[a]rria's entire testimony was speculative and conjecture as it related to BGB.

4. [Whether the trial c]ourt made an error of law and abuse of discretion in allowing 404(b) evidence in trial where the Commonwealth failed to provide any actual notice of a 404(b) filing and the 404(b) evidence, including drug dealing, possession of weapons and drugs, and social media posts was not related to [Appellant] [?]

5. [Whether the trial c]ourt made an error of law and abuse of discretion in allowing the playing of rap videos and publication of written lyrics associated with said videos as their very limited probative value, if any, was greatly outweighed by their prejudicial effect and there was no evidence presented that [Appellant] was involved in any way with said rap videos[?]

6. [Whether the trial c]ourt made an error of law and abuse of discretion in denying Appellant's motion *in limine* to preclude evidence of gang affiliation[?]

7. [Whether the trial] court made an error of law and abuse of discretion in denying Appellant's motion *in limine* to preclude evidence of rap videos and lyrics[?]

8. [Whether the trial c]ourt made an error of law and abuse of discretion in giving the consciousness of guilty/flight instruction based upon the testimony elicited at trial[?]

Appellant submits that there was no evidence of flight.

9. [Whether t]he jury's verdict was against the weight of the evidence because the weight of the evidence demonstrated a reasonable doubt as to whether the Appellant had committed the crimes charged[?]

10. [Whether t]he trial court committed an error law in denying Appellant's post sentence motion for

judgment of acquittal based upon the fact that evidence introduced at trial was not legally sufficient to support the verdict because the evidence failed to establish each material element of the crimes charged and the commission thereof by the Appellant beyond a reasonable doubt, including the charge of conspiracy and murder in the first degree[?]

Appellant's brief at 4-9 (extraneous capitalization omitted).

## I. Severance

Appellant first argues that the trial court abused its discretion in denying his motion to sever his case from that of his co-defendants. *Id.* at 34-41.

A motion for severance is addressed to the sound discretion of the trial court, and ... its decision will not be disturbed absent a manifest abuse of discretion. The critical consideration is whether the appellant was prejudiced by the trial court's decision not to sever. The appellant bears the burden of establishing such prejudice.

*Commonwealth v. Page*, 59 A.3d 1118, 1133 (Pa.Super. 2013) (citation omitted), *appeal denied*, 80 A.3d 776 (Pa. 2013).

Our Rules of Criminal Procedure provide as follows:

(1)  Offenses charged in separate indictments or informations may be tried together if:

(a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or

(b) the offenses charged are based on the same act or transaction.

Pa.R.Crim.P. 582(A). Furthermore, "[t]he court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together." Pa.R.Crim.P. 583.

## II-III. Expert Opinion Testimony

Appellant next argues the trial court abused its discretion in allowing opinion Lieutenant Erick Echevarria to testify as an expert in gang structure and organization and drug trafficking. Appellant's brief at 44-47.

It is well settled that expert testimony is admissible if it concerns a subject beyond the knowledge, information, or skill possessed by the average layperson, as phenomena and situations that are matters of common knowledge may not be the subject of expert testimony. Pa.R.E. 702.

> [I]n cases involving the admission of expert testimony . . . the admission of expert testimony is a matter left largely to the discretion of the trial court, and its rulings thereon will not be reversed absent an abuse of discretion. An expert's testimony is admissible when it is based on facts of record and will not cause confusion or prejudice.

*Commonwealth v. Huggins*, 68 A.3d 962, 966 (Pa.Super. 2013) (citation omitted), *appeal denied*, 80 A.3d 775 (Pa. 2013).

## IV-VII. Admissibility of Prior Bad Act Evidence

Appellant next argues that the trial court abused its discretion admitting prior bad act evidence, including various gang-related evidence and the admission of rap videos and lyrics. Appellant's brief at 41-43, 47-51.

"[T]he admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Fransen*, 42 A.3d 1100, 1106 (Pa.Super. 2012) (citation omitted), *appeal denied*, 76 A.3d 538 (Pa. 2013).

It is well settled that "evidence of prior crimes is not admissible for the sole purpose of demonstrating a criminal defendant's propensity to commit crimes." *Commonwealth v. Melendez-Rodriguez*, 856 A.2d 1278, 1283 (Pa.Super. 2004) (*en banc*); *see also* Pa.R.E. 404(b)(1). Nevertheless, "[e]vidence may be admissible in certain circumstances where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character." *Id.* Specifically, evidence of other crimes or bad acts is admissible evidence of other crimes may be introduced to show:

> motive; intent; absence of mistake or accident; a common scheme or plan; and identity. The evidence may also be admissible to impeach the credibility of a testifying defendant; to show that the defendant has used the prior bad acts to threaten the victim; and in situations where the bad acts were part of a chain or sequence of events that formed the history of the case and were part of its natural development.

*Commonwealth v. Reid*, 811 A.2d 530, 550 (Pa. 2002) (citations and numeration omitted), *cert. denied*, 540 U.S. 850 (2003); *see also* Pa.R.E. 404(b)(2). When offered for a legitimate purpose, evidence of prior crimes or

bad acts is admissible "if the probative value of the evidence outweighs its potential for unfair prejudice." ***Commonwealth v. Hairston***, 84 A.3d 657, 665 (Pa. 2014) (citation omitted), ***cert. denied***, 574 U.S. 863 (2014).

## VIII.  Jury Instructions

Appellant next argues that the trial court erred by providing the jury with the consciousness of guilt/flight jury instruction.  Appellant's brief at 51-52.

"[A] trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." ***Commonwealth v. Charleston***, 94 A.3d 1012, 1021 (Pa.Super. 2014), ***appeal denied***, 104 A.3d 523 (Pa. 2014) (citation omitted).  "A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue." ***Commonwealth v. Sandusky***, 77 A.3d 663, 667 (Pa.Super. 2013).

## IX.  Weight of the Evidence

Appellant next argues that the jury's verdict was not supported by the weight of the evidence.  Appellant's brief at 57-58.

This Court has recognized that "[a]n allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court."

*Commonwealth v. Galvin*, 985 A.2d 783, 793 (Pa. 2009) (citation omitted),

*cert. denied*, 559 U.S. 1051 (2010).

> [W]here the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Shaffer*, 40 A.3d 1250, 1253 (Pa.Super. 2012) (citation

omitted).

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence.
>
> . . . .
>
> Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citations and

emphasis omitted).

## X.  Sufficiency of the Evidence

Lastly, Appellant argues that there was insufficient evidence to sustain

his conviction for first-degree murder and criminal conspiracy to commit

murder.  Appellant's brief at 52-57.

> In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to prove every element of the offense beyond a reasonable doubt. As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. Any question of doubt is for the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Thomas*, 988 A.2d 669, 670 (Pa.Super. 2009) (citations omitted), *appeal denied*, 4 A.3d 1054 (Pa. 2010).

Following a thorough review of the record, including the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, it is our determination that Appellant's claims on appeal warrant no relief. In its extensive 67-page opinion, the trial court comprehensively discussed each of Appellant's allegations of error and concluded that they are without merit or waived. *See* trial court opinion, 5/13/22 at 36-66. We find that the trial court's conclusions are supported by competent evidence and are clearly free of legal error.

Accordingly, we adopt the comprehensive May 13, 2022 opinion of the Honorable William R. Carpenter as our own for purposes of this appellate review.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/20/2023

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :            CP-46-CR-0006411-2019
                                        :
                 V.                     :
                                        :
DERRICK GOINS                           :            **513 EDA 2022**

                        **1925(a) OPINION**

**CARPENTER  J.**                                **MAY 13, 2022**

                        INTRODUCTION

Appellant, Derrick Goins ("Goins"), appeals from his judgment of
sentence entered on January 13, 2022, following his conviction of first-degree
murder and criminal conspiracy. Goins was sentenced to a life term of
imprisonment.

Goins' convictions arose out of a conspiracy with co-defendants,
Kyshan Brinkley and Jacquan Lee, to murder Keith Robinson, a rival drug
dealer to the home-grown Pottstown gang, Bud Gang Bitch ("BGB"). On March
30, 2019, at about 10:53 p.m., the victim's vehicle was sprayed with bullets,
while the victim was parked at the corner of York and Walnut Streets,
Pottstown. Two of the ten bullets hit the victim and killed him. Goins left the
scene in a black van with co-defendants Brinkley and Lee, and a few minutes
later arrived at the 206 Manatawey Street apartment complex.

Specifically as to Goins, earlier in the evening of March 30, 2019, Goins was with his co-defendants Brinkley and Lee at a gathering. Several witnesses identified Goins as being present at the Chestnut and Evans Streets gathering location. Witnesses observed Goins leave there with his co-defendants and Elijah Davis in a black van. A short time later, a black van was captured twice on surveillance in the vicinity of the victim's car, actually circling the victim's car. A witness who was in the area of the murder scene, just prior to the murder, observed Goins pacing in an alleyway. After the murder, Goins was observed at 206 Manatawny Street apartment complex, the BGB gang trap house, along with his co-defendants. Additionally, Goins' cell phone records from the night of the murder show that the movements of his cell phone were consistent with those of co-defendant Brinkley's cell phone, that put both in the area of the murder at the relevant time, traveling back to 206 Manatawny Street, then a short time later their cell phones traveled to a gas station, and then to the Uncut club in Philadelphia. Surveillance footage corroborates that a black van was at the murder scene, at 206 Manatawny Street, and at a nearby gas station at times that match up to the cell phone records. The surveillance at the gas station depicted Goins exiting the black van. Finally, the evidence showed that Goins had rented a black dodge caravan minivan on March 29, 2019 and returned it April 2, 2019. With all this evidence the jury convicted Goins of conspiring with his co-defendants to murder the victim.

On appeal, Goins alleges error in several pre-trial rulings, denying his motion to sever, admitting various gang-related evidence, including the drug expert opinion of Lieutenant Erick Echevarria and the admission of rap videos and lyrics; providing the jury with the consciousness of guilt/flight jury instruction; the weight of the evidence; and the sufficiency of the evidence.

<u>FACTUAL AND PROCEDURAL HISTORY</u>

On January 3, 2022, the eight-day trial commenced where the following facts were established. The Commonwealth first presented the trial testimony of Gregory Byrd, the victim's younger brother. (N.T., Trial by Jury, Day 2 of 8, 1/4/22. P. 65). Mr. Byrd testified that his brother was living in Pottstown and had lived there for about 18 years, however, he was born and raised in Philadelphia. <u>Id.</u> 66 – 67. The victim was 41-years-old at the time of his murder, and was also known as Naz and Esco. <u>Id.</u> at 65, 67, 84. At the time of his murder, Mr. Robinson worked in construction, and he also sold cocaine with Mr. Byrd. <u>Id.</u> at 68.

In the morning of March 30, 2019, Mr. Byrd was selling drugs, while his brother was out riding his motorcycle. <u>Id.</u> at 69. He delivered drugs to individuals he knew as KK and Valerie. <u>Id.</u> Mr. Byrd and the victim met up later that day, but went their separate ways at 10:00 p.m., until the victim returned to help him with a flat tire. <u>Id.</u> at 70 – 72. The victim arrived in a green Infinity Jeep, and drove his brother back to his apartment. <u>Id.</u> at 72 – 73. That was the last time they saw each other. <u>Id.</u> at 74.

3

At approximately 10:53 p.m., Officer Andrew Licwinko of the Pottstown Borough Police Department, responded to the area of York Street and Walnut Street in Pottstownfor shots fired in that area. Id. at 98, 99 – 100. Upon his arrival there he observed a dark-colored Infinity parked close to the intersection, with the passenger window broken out. Id. at 100. A volunteer firefighter was on the driver's side tending to a male, who was slumped over in the driver's seat, and later identified as Keith Robinson. Id. at 100 – 101. Officer Licwinko, along with the firefighter, pulled the victim from his car. Id. at 101. He had multiple gunshot wounds to his chest and neck, and no pulse. Id. The victim was transported to the hospital, where he was pronounced dead. Id. at 102. Officer Licwinko secured the crime scene and identified eight spent shell casings. Id. at 105 – 106.

Karen Clarke was a resident of 128 North York Street, in March of 2019. Id. at 140. Ms. Clarke, a/k/a KK, lived in the first floor apartment and Valerie Miller was her neighbor in the second floor apartment. Id. at 141, 144. Ms. Clarke knew the victim, who she called Naz, because she bought cocaine from him in the past. Id. at 142. On the day of the murder, Ms. Clarke texted the victim around 7:00 p.m. and then around 10:00 p.m. At 10:47, the Mr. Robinson texted back, "Outside." Ms. Clarke alerted Ms. Miller that the victim was there. Id. at 150. A few minutes later, Ms. Clarke heard gunshots. Id. at 150. Ms. Clarke made her way to the front door and yelled to Ms. Miller to come back inside. Id. Ms. Miller got out of the car and said, "Oh, my God, Naz been shot. So call 9-1-1." Id. Ms. Clarke retrieved her phone from inside the

4

house, and went outside by the driver's side of the victim's car and called 9-1-1. Id. at 150 – 151.

Valerie Miller testified that she knew the Mr. Robinson through his girlfriend, Renada. Id. at 179. On March 30, 2019, she and Ms. Clarke were trying to buy drugs from him. Id. at 180. At some point when the victim was there, Ms. Miller got into his car, and while in the car she heard gunshots being fired. Id. at 181 - 182.

Dr. Gregory McDonald, the Chief Deputy Coroner for Montgomery County, performed an autopsy on the victim on March 31, 2019. Id. at 209, 217. Dr. McDonald's examination revealed two entrance gunshot wounds, one on the right side of the neck and the other to the right side of the chest. Id. at 218. Dr. McDonald concluded that the victim died of multiple gunshot wounds. Id. at 227. He opined that either gunshot wound was potentially fatal, and that the victim would have died within several minutes from these injuries. Id.

Detective Robert Turner, a detective with the Montgomery County Detective Bureau – Forensic Services Unit, was called to the scene of the crime and arrived around 12:15 a.m. Id. at 234, 237 – 238. Detective Turner did a scene walk-through. Id. at 239. The detective testified that based upon the shell casings that were identified, shooter would have about 30 feet to 46 feet away from the passenger door of the victim's vehicle. Id. at 243 – 244. Detective Turner recovered nine spent shell casings. Id. at 245. They were all .40-caliber, manufacturer was Smith and Wesson and two brands, Blazer and CBC. Id. at 247 – 248.

Detective Turner was contacted by Lieutenant Kuklentz about twenty minutes after his arrival to go to an additional location at 47 Beech Street, about a block and a half from the crime scene. Id. at 260, 262. He and Detective Schanes went there and spoke to Detective Kelly. Detective Kelly had located a black jacket inside a residential dumpster right outside the 47 Beech Street residence. Id. at 260 – 261. An orange Bic cigarette lighter was found in the jacket's pocket. Id. at 266. Directly across from 47 Beech Street is 44 Beech Street, and laying on the curb line on the roadway, the detective recovered another .40-caliber Smith and Wesson, brand CBC spent, fired shell casing. Id. at 268 – 269, 272.

Detective Kathleen Kelly, of the Montgomery County Detective Bureau responded to the crime scene in the area of York and Walnut Streets. (N.T., Trial by Jury – Day 3 of 8, 1/5/22, p. 8). Detective Kelly and Detective Mull from Pottstown, walked around the crime scene and found a jacket in a trash can, located right in front of 47 Beech Street. Id. at 10 - 11, 12. The jacket was laying right on top of the trash. Id. at 11.

Johnny Walker, the resident at 47 Beech Street, testified that on March 30, 2019, he took the trash out around 4:00 or 4:30 p.m. Id. at 32. That night he was on the couch in his first floor living room when he heard gunshots. Id. at 33. He also heard the trash can lid open and shut, and someone put trash inside. Id. Mr. Walker told detectives that the jacket did not belong to him or any other resident at 47 Beech Street. Id. at 34.

6

Elias Scipio, a volunteer firefighter back in March of 2019, and on March 30, 2019, at around 10:00 or 10:30 p.m., he was on Walnut Street to pick up his friend. Id. at 50 – 51. He was looking for parking, and when he pulled into Union Alley, he witnessed a male walking towards his vehicle. Id. at 53. Mr. Scipio described the male as a light-skinned male, athletic build, with twists in his hair. Id. The male was pacing back and forth. He started to approach Mr. Scipio's vehicle, which made him feel uncomfortable so he left the alley. Id. at 54. Mr. Scipio got a good look at the individual and further described him as wearing dark-colored clothing, such as a dark-color hoodie or jacket. Id. at 55, 57. On May 3, 2019, Mr. Scipio spoke with Lieutenant James McGowen at the Pottstown Police Department. Id. at 57 – 58, 96. There he identified Goins as the individual he observed in the alleyway in a photo array. Id. at 63, 65, 96.

After leaving the that neighborhood for a period of five minutes, Mr. Scipio returned and observed a vehicle sitting on the corner with all of its windows shattered and two females standing outside the vehicle. Id. at 67 – 68. He got out of his car, and attempted to assist the victim. Id. at 68.

Lieutenant Todd Richard of the Montgomery County Detective Bureau - Homicide Unit and lead detective reviewed various items of video surveillance, namely footage from the Pottstown Borough cameras. Id. at 112 - 114. He was on alert to look for a black Dodge minivan, which had been identified by witnesses as a vehicle that suspects were seen in before and after the murder. Id. Also during the course of his investigation he received

7

information that the suspects were at a gathering on Chestnut and Evans Streets. Id. at 116.

The Commonwealth played a video surveillance clip taken about a block and a half away from that gathering. Id. at 117. The lieutenant identified the black Dodge minivan which at 10:45 p.m. had left from Chestnut Street and turned onto Washington Street. Id. Additional video depicted the black Dodge minivan at about 10:51 p.m., go westbound on Walnut Street and travel on Walnut Street towards the intersection of Walnut and York Streets. Id. at 118, 120 – 121, 130. An individual from the right side of the video frame walked to the middle of the video frame, and the individual goes out of the frame at the top of the video. Id. at 134. The individual runs back from the left to the right of the video frame. Id. Further, video was obtained from 26 Walnut Street, in which the audio recorded gunshots at 10:52 p.m. Id. at 122 – 123,126 – 128.

Jamar Baird[1] testified that on March 30, 2019, he was at the Chestnut and Evans Streets gathering, and he was there with "Key", identified in court as co-defendant Brinkley. Id. at 161 – 162. Mr. Baird acknowledged that at some point that night there was a plan to go to a club in Philadelphia. Id. at 162. Before they drove down to the club, he went with "E" to Beech and Manatawny. Id. at 163 – 164. Using the grand jury testimony to refresh his

---

[1]     Upon questioning by the Commonwealth, Mr. Baird did not have any independent memory of the events of March 30, 2019. (N.T., Trial by Jury - Day 3 of 8, 1/5/22, pp. 155 – 156). The Commonwealth presented him with a transcript of his grand jury testimony taken on May 15, 2019. Id. at 157. He continued to claim that he did not remember anything from March 30, 2019. Id. at 158 – 159. It did not refresh his recollection. Id. at 160.

8

recollection, Mr. Baird testified that "Swizz" "and them pulled off" from Chestnut and Evans Street right before he left with "E." Id. at 165 – 166. Mr. Baird identified in court that "Swizz" is co-defendant Lee. Id. at 167. According to Mr. Baird's grand jury testimony, "D" might have been in the van with Swizz. Id. at 166 – 167. He identified in court that "D" is co-defendant Goins. The Court dismissed Mr. Baird, subject to recall. Id. at 170.

Jahtae Booker, was also at the gathering at Chestnut and Evans Streets. Id. at 171. Mr. Booker testified that Goins was present. Id. at 193. Several minutes after arriving, Ms. Booker left, and, at the direction of co-defendant Lee, he dropped his friend off at 206 Manatawny Street. Id. at 171, 172 – 173. A short time later when he got to 206 Manatawny Street, Mr. Booker heard gunshots coming from a distance. Id. at 174, 194. Mr. Booker testified that Goins and co-defendant Lee were in the parking lot of 206 Manatawny Street. Id. at 174 – 175, 184. Mr. Booker left the area. Id. at 175.

Upon further questioning, Mr. Booker did not remember answers to questions he previously testified to at a grand jury. Id. at 176. The Commonwealth introduced his June 5, 2019 grand jury testimony where he testified that the vehicle he saw that went to the club in Philadelphia was at the Gulf gas station, and it was a van. Id. at 176 – 178. At the club, Mr. Booker saw Goins, co-defendant Lee, and co-defendant Brinkley. Id. at 190. They all stayed until closing time. Id. While nobody talked about the murder, people were posting stuff about the victim's death. Id. at 191.

9

Additional video surveillance was recovered by both Detective Brooke Hatfield and Detective Michael Glauner, both of the Pottstown Police Department. The former recovered surveillance from 112 Walnut Street[2], 26 Walnut Street, and from the Gulf station[3]. Id. at 211 - 212. Detective Glauner recovered video footage from the camera located at Chestnut and Washington Streets. Id. at 265.

Comese Robinson, a resident of 107 Walnut Street, Unit F, Foundry Apartments, testified that on the night of the murder, just before 11:00 p.m., she heard gunshots. Id. at 278, 280. After waiting about two minutes, she saw a figure running though the parking lot on York Street towards Beech Street. Id. at 280, 281. The figure was wearing all black and was hunched over with something in his right pocket. Id. at 282. At the corner of York and Beech streets, the figure went to turn onto Beech Street, but did an about face and pulled the hood off his head. Id. at 283. There was a police officer at the corner of Beech and York. Id. After the police drove by, the individual continued to go back around the corner down Beech Street. Id. at 284.

Robert Garcia, a resident of 48 Beech Street, testified that on March 30, 2019, he was across the street from his house when he heard gunfire. Id. at 298. He and his wife went back to their house, and as he set

---

[2]    Detective Hatfield testified that the time stamp on the video from 112 Walnut Street was one hour slow from real time. (N.T., Trial by Jury – Day 3 of 8, 1/5/22, p. 213).

[3]    The video from the Gulf station was about 15 minutes fast. Id.

10

stuff down inside the door he turned around and saw someone coming down the sidewalk on Beech Street. Id. at 299. The person was about 25 yards south of York Street headed toward Manatawny Street. Id. The person went right into the alleyway, between 47 and 43 Beech Street, and stopped. Id. at 301. Mr. Garcia testified that the person was wearing sweats and a hoodie, dark in color. Id. at 302. The person had his right hand inside the right side of the jacket or hoodie. Id. at 303 – 304.

Lieutenant Todd Richard was recalled to testify. (N.T., Trial by Jury – Day 4 of 8, 1/6/22, p. 11). Lieutenant Richard testified that the investigation into the murder was lengthy. Id. at 12. On April 9, 2019, he became aware that a black van was involved in the murder, and then investigators developed more information about the van. Id. at 13. On April 10, 2019, video footage was taken from the Gulf gas station, when he found out that location was relevant. Id. at 13 – 14. He further discovered that 206 Manatawny Street location was involved in this investigation, and he obtained video footage from there. Id. at 14. A drone video was also made in order to demonstrate the crime scene, as to where the shooting occurred, where the jacket was found, where the shell casing was recovered, and the alleyway that they ran to after the shooting. Id. at 14 – 15. Lieutenant Richard testified that to travel by car from York and Walnut Streets to 206 Manatawny, it would take a minute or less. Id. at 21 – 22.

Lieutenant Richard also obtained video from the exterior of 206 Manatawny Court Apartments, and he gathered information about individuals

11

associated with that apartment C2. Id. at 22. He obtained a cell phone picture of four guns that had been taken inside that apartment prior to the murder. Id. The lieutenant watched the video from about 9:00 p.m. up until 11:30, 12 o'clock on the night of the murder. Id. He was watching for a black van pulling into the parking lot. Id. at 23. The van had several distinctive features, and at 11:00 p.m., this black van backs into the parking lot at Building 206. Id. at 24 – 25. The video depicts several people entering the doorway of the apartment building, and the door opening to where C2 would be. Id. at 25 – 26. At 11:10 p.m., the van pulls out of the parking lot. Id. at 27. At some point in his investigation he became aware that Goins, co-defendant Brinkley, and co-defendant Lee had been driving a black van on the night of the murder. Id. at 76. He also learned that it was Goins who had rented a black van. Id. at 75 – 76.

A search warrant was obtained for 206 Manatawny, Apartment C2, and was executed on April 3, 2019. Id. The lieutenant described the apartment as not set up to live in. Id. He detailed what was found in relevant part, a Glock magazine fully loaded in a plastic sandwich bag; a Colt .45 handgun with an extended magazine that was loaded and which had been determined to be stolen out of Philadelphia; a CenterPoint crossbow; a box of Remington .45 ammunition; a plastic bag of .380 caliber ammunition; and a receipt with Jamar Baird's phone number on it. Id. at 28 – 36.

The search also uncovered drugs, and drug paraphernalia, including, plastic vial lids commonly used for packaging illegal narcotics, box of

wax baggies commonly used for packaging heroin, measuring cup with white residue, pink lids for vials, grocery bag containing two blocks of a white substance, bags stamped with stamps depicting two guns and the word "shooter", a bag of white powdery substance, blue baggies, purple vial lids, digital scale, and Suboxone patches. Id. at 36 – 47.

Search warrants for several individuals' DNA were obtained, including Goins, co-defendant Lee, co-defendant Brinkley, Jamar Baird, and Elijah Davis. Id. at 52. He also obtained the DNA of Makael Bevins by consent. Id.

Officer Jason Smaron of the Philadelphia Police Department responded to the area of 1700 block of Chancellor Street on June 9, 2020 for a theft of a construction site. Id. at 164. As one of the suspects ran away, he threw a handgun underneath a car before being apprehended. Id. at 165 – 166. Officer Smaron identified the firearm as a Glock .40 caliber, nine-millimeter handgun. Id. at 167.

Taylor Richart, a forensic DNA scientist with the Commonwealth of Pennsylvania was accepted as an expert in the field of DNA profiling. Id. at 179, 182. He performed DNA analysis on the zipper pulls and snaps of the black jacket. Id. at 188. The major component of the profile mixture matched the DNA sample from co-defendant Lee. Id. at 191. As to the collar strap of the jacket, again the major contributor to that profile mixture was co-defendant Lee. Id. at 193 – 194.

Jordan Valenci, an employee at Enterprise Rent-A-Car identified a rental agreement in which the rental was picked up on March 29, 2019 at 10:16 a.m., and returned April 2, 2019, at 9:46 p.m. at the Pottstown location. Id. at 286, 288 – 289. It was a 2019 black Dodge Caravan, and was rented by Goins. Id. at 289.

Jamar Baird re-took the stand. (N.T., Trial by Jury – Day 5 of 8, 1/10/22, p. 11). The Commonwealth asked again, the question of whether co-defendant Lee was still at the first location, when Mr. Baird left. The Commonwealth read into the record Mr. Baird's grand jury testimony in which he answered that co-defendant Lee left the gathering before he did, and that co-defendant Lee was going to "do something, handle something." Id. at 12.

Mr. Baird acknowledged that his nickname is "Spazz," and that he used that name as an aspiring rapper. Id. at 13. He put out some rap videos, and in the videos there are references to BGB. Id. Mr. Baird explained that BGB, stands for Bud Gang Bitch, in memory of his close friend, Bud, that passed away. Id. at 13 – 14.

On cross-examination, Mr. Baird denied that co-defendant Lee is a part of BGB. Id. at 22. In fact, Mr. Baird denied that BGB is a gang, saying it is "nothing to be a part of." Id. at 23. He also denied that Goins was a part of BGB. Id. at 41. Further, Mr. Baird testified that BGB was named for his friend, Jordan Scott, nickname Bud, who was shot and killed. Id. at 55 - 56. Mr. Baird rejected the idea that BGB was organized for the purpose of selling drugs in Pottstown. Id. at 56. According to him, it was merely a group organized as a

14

way to remember a close friend that was shot and killed. Id. Finally, Mr. Baird testified that he was walking with co-defendant Brinkley down Walnut Street on the way to the gathering when they saw the victim. Id. at 62. There was no conversation between them. Id. at 65. As to leaving the gathering at Chestnut and Evans, Mr. Baird remembered that co-defendant Lee left there, and he was driving a van. Id. at 71 – 72.

On re-direct, Mr. Baird testified that when he left Chestnut and Evans, he told co-defendant Lee that he would meet him at Beech and Manatawny. Id. at 83. Co-defendant Lee arrived at that location about fifteen to twenty minutes after Mr. Baird heard the gunshots. Id. He arrived there driving a van. Id. Mr. Baird also stated that Goins and co-Brinkley were with co-defendant Lee, and that they arrived in the van. Id. They all left Beech and Mantawny in the van, they picked up two more people, they went to the Gulf gas station, and then straight down to Philadelphia. Id. at 84 – 85.

Detective Eric Nelson of the Montgomery County District Attorney's Officer – Forensics unit- is the firearm and tool marker examiner for the county and was accepted as an expert in firearm and tool maker identification. Id. at 99, 10 2 – 103. He was involved in the analysis of various ballistic items related to the murder. Id. at 109. He first analyzed ten fired shell casings a/k/a fired cartridge cases, which were .40 caliber, Smith and Wesson. Id. at 111. All ten fired cartridge cases were microscopically examined and the detective determined they were all fired from the same pistol. Id. at 114 – 115. He also received six projectiles, which are bullet specimens, for his review. Id. at 111.

15

Detective Nelson determined that the six projectiles were all consistent with .40 caliber ammunition. Four of the six were consistent with .40 caliber ammunition with the same type of rifling (rifling are those lands and grooves inside a barrel.). Id. at 113. The other two projectiles were too mutilated or distorted and damaged to give a type of rifling. Id.

At the time of his examination, Detective Nelson did not have a firearm to compare to it. He submitted a fired cartridge case to the Integrative Ballistic Identification System ("IBIS")[4]. Id. at 116. The detective was notified that there was a match from a case in Philadelphia. Id. at 117 – 118. It was a high-confidence hit that the shell casing matched a Glock firearm submitted to the IBIS system in Philadelphia. Id. at 119 – 120. The Philadelphia Police Department had the actual semi-automatic pistol that they test-fired and they took one of the test fired shells and submitted that to IBIS. Id. at 120. Detective Nelson went to the Philadelphia Firearms Unit, met with the assigned examiner, and examined the Glock pistol. Id. The detective test fired it himself, and compared the test fires to the shell casings in this case. Id. They were a match. Id. Detective Nelson determined that he Glock pistol from Philadelphia was in fact the pistol that fired the ten shell casings in this case. Id.

Jarid Majors, was a resident of 126 North York Street in March of 2019. Id. at 227. At some point on March 30, 2019, he went to a gathering a

---

[4] IBIS is a computer-based database that takes digital images of the cartridge case, specifically the microscopic marks left on a fired cartridge case. (N.T., Trial by Jury- Day 5 of 8, 1/10/22, 116). This image is put into the database, and it searches for other fired cartridge cases that have been entered into the IBIS system for a match. Id. at 116 – 117.

16

Chetnut and Evans Street around 9:00 p.m. Id. at 228. He was there for about 10 to 15 minutes. Id. He left the gathering, and when he came back home later that night, he saw a lot of cops there. Id. Before he arrived he was aware that someone got shot in front of his house. Id. He denied knowing the victim. Id. at 229 - 230.

Mr. Majors testified that he knew co-defendant Lee, and he knew him as "Quan" or "Swizz." Id. Mr. Majors had told police in his statement that he has seen co-defendant Lee at 206 Manatawny Street. Id. at 235 - 236. Mr. Majors also knew Goins, who goes by "D," and c-defendant Brinkley who goes by "Key" or "Dread." Id. at 236 - 237. Mr. Majors testified that after he spoke with police regarding the murder, he warned several of his friends that police had gotten their numbers from his phone. Id. at 237 – 238.

Mr. Majors was questioned about BGB, which he was aware of. Id. at 239 – 240. He was also aware that that BGB has put out rap videos, and that he was featured in some of them. Id. at 240.

Kelise Smith was a resident of Pottstown, in March of 2019. Id. at 328. On March 30, 2019, in the afternoon, Ms. Smith was on Chestnut Street and Evans Street. Id. at 328 – 329, 335. She was there with several of her friends, her sister, Denasia, and her sister's friends. Id. at 330. Ms. Smith further testified that while she was at the gathering at Chestnut and Evan Streets, co-defendant Lee came by around 9:00 p.m., in the van. Id. at 339. She stated that Goins and co-defendant Brinkley were at also Chestnut and Evans Streets hanging out. Id. at 339 – 340, 34. Someone suggested going to a

17

club, and Ms. Smith and her friends went back to Denasia's house to change. Id. at 330, 335. Ms. Smith testified that when they left Chestnut and Evans Streets gathering to get dressed, Goins, co-defendants Brinkley, and co-defendant Lee were still there. Id. at 357. Ms. Smith and Denasia were back at Denasia's house for about ten minutes, then they got picked up by a van. Id. at 331, 335 - 336. Ms. Smith testified that co-defendant Lee was driving the van, and also in the van were Goins, co-defendant Brinkley, Jamir Baird, and Elijah Davis. Id. at 333, 336 – 337, 341. After they got picked up they stopped at a gas station in Pottstown. Id. at 358.

Sometime that night, Ms. Smith found out that Keith Robinson, who she knew as "Naz" was murdered. Id. at 342. Mr. Robinson was close with her family, and that is how she knew him. Id. at 342 – 343. The topic came up in the van that Naz had died. Id. at 373 – 375.

The Commonwealth recalled Lieutenant Todd Richard to testify regarding video surveillance that was obtained from the Gulf gas station. Id. at 380. The lieutenant testified that at about 11:27 p.m., the video shows a black van pulled up to the gas station, and that co-defendant Lee got out the van and walked into the store. Id. at 382. The video from inside the store showed that co-defendant Lee grabbed a lighter. Id. at 383. The outside video shows Goins exit the passenger seat, and that he also went into the store. Id.

On day six of the trial, the Commonwealth presented the expert testimony of Detective William Mitchell, a detective with the Montgomery County Detective Bureau – Homicide Unit. (N.T., Trial by Jury – Day 6 of 8,

18

1/11/22, p. 6 – 7). He was accepted as an expert of cell phone record analysis. Id. at 10. The detective obtained call details for Goins, co-defendant Brinkley, and Eiljah Davis[5]. Id. at 10 – 11. He did not obtain co-defendant Lee's cell phone records because the cell phones that were recovered were activated two weeks after the homicide occurred, and investigators were unable to obtain a good cell number for him during the time of the homicide. Id. at 13.

First, the detective spoke about co-defendant Brinkley's cell phone records, stating that on March 30, 2019, at 9:16 p.m., co-defendant Brinkley's cell phone was using a cell site on the east end of Pottstown. Id. at 27. Co-defendant Brinkley has no other cellular activity until the following day at 1:18. Id. at 28. However, there were data transmissions after that, including iMessaging texts, social media accounts, Instagram accounts, e-mails. Id. at 28.

At 9:48 to 9:57 p.m., Goins' cell phone was using a cell site at Shoemaker Road, and the sector is facing the hangout location at Chestnut and Evans Streets. Id. at 29.

Between 10:11 and 10:25 p.m., co-defendant Brinkley's cell phone, using data transmissions, was using a cell site that was in the east end of town, encompassing the gas stations and the hangout location. Id. at 31. Around 10:41 p.m. just prior to the murder, Goins' cell phone was using the sector of a cell site that faces the homicide location. Id. at 32.

---

[5] He explained that he obtained the call records of Davis because he was one of the individuals at the hangout location at Chestnut and Evans Streets, he was in the van, and he also went to the Uncut club in Philadelphia afterwards. (N.T., Trial by Jury – Day 6 of 8, 1/11/22, p. 13).

The detective next testified about a still image from video surveillance footage in the area of the homicide showing a black minivan by the building, with the victim's vehicle off to the side of the video still shot. Id. at 33. The 9-1-1 call was at 10:53 p.m. Id. at 33. A few minutes after the homicide co-defendant Brinkley's cell phone was hitting the tower right by the homicide location. Id. The detective identified a still shot image of the van arriving at 206 Manatawny Street just after the homicide occurred at 11:01 or 11:02 p.m. Id. From 10:57 to 11:14 p.m., there are several incoming calls sent to voice mail, and at that time the cell site tower was across the river in Chester County[6], and then the cell phone was using the cell site that was off Shoemaker Road, which is .2 miles away from 206 Manatawny Street. Id. at 34, 36. From 11:12 to 11:19 p.m., co-defendant Brinkley's cell phone was using the Shoemaker Road tower exclusively. Id. at 36. That is the location where the still image showed the van pulling in to that location. Id.

Sometime after 11:25 p.m., the detective testified that co-defendant Brinkley's cell phone began using multiple cell towers during a data transmission, and moved to the cell site by the gas station. Id. At that time, the detective noted that in the surveillance video the van pulled into the gas

---

[6]     The detective testified that he often with cell phones that are down in the area of the southern portion of Pottstown that the cell site across the river in Chester County will be used because of its location it provides good access to the southern portion of Pottstown. (N.T., Trial by Jury- Day 6 of 8, 1/11/22, p. 34 – 35). The detective explained that whenever a cell phone is utilizing a tower, it is not necessarily the tower that is closest, but rather the tower with the strongest signal. Id. at 35. He further stated that in his experience it is usually the closest tower but not always the case. Id. That is the reason that he compares other evidence in the case when evaluating the call records. Id.

20

station. Id. Therefore, the cell phone records are consistent with co-defendant Brinkley's cell phone leaving the area of 206 Manatawny Street and going to the gas station where the van pulls in. Id.

As to Goins' cell phone, there were two cell sites being utilized, the first which faces the sector at Manatawny Street, and the second cell site, it faced the gas station location, and there was a NELOS[7] record for the time frame when the van actually pulls into the gas station. Id. at 37. The NELOS record encompasses where the gas station location where they end up driving to during that time frame. Id. Detective Mitchell opined that this is indicative of the cell phone leaving the area of Manatawny and going towards the area of the gas station. Id.

The detective showed snapshots at 11:28 where that van pulled into the gas station, and Goins' entering the store at the gas station at 11:30 p.m. Id. at 38. After the van left the gas station, the cell sites for co-defendant Brinkley travel and go into Philadelphia, to the area of the Uncut club. Id. The cell phone arrived, and used towers in the area of the club at 12:42 a.m. Id.

Goins' cell site information during this time is consistent with traveling from the area of the gas station and traveling to the Uncut club, but his cell phone arrives there a little bit later, around 1:05 a.m., rather than the other ones which were around 12:30 a.m. Id. at 39 – 40. After 2:14 a.m., the

---

[7]     A NELOS record is information specific to AT&T, where it provides handset information in a general area, represented by a circle around a location. The circle can be bigger or smaller depending on AT&T's calculation of where the handset it located. (N.T., Trial by Jury- Day 6 of 8, 1/11/22, p. 26).

21

records show that the cell phones leave the area of the Uncut club and begin to travel north. Id. at 40. Co-defendant Brinkley's cell phone travels north, past the vicinity of Gratz Street, where the murder weapon was eventually found. Id. at 40 - 42. Detective Mitchell testified that this route taken by co-defendant Brinkley's cell phone was not the most direct route back to Pottstown. Id. at 41 – 42. Goins' cell phone travels the same trajectory, leaving the club around 2:05 a.m., traveling north, and then traveling in a western and northern direction back to Pottstown. His cell phone was accessing cell sites in Pottstown at 3:47 a.m. Id. at 42. Co-defendant Brinkley's cell phone accessed cell site towers in Pottstown at 3:57 a.m. Id. at 43.

Next to testify was Elijah Williams, an inmate at Bucks County Correctional Facility. Id. at 118. He had been incarcerated in Montgomery County Correctional Facility in the summer of 2021. Id. Around June and July 2021, he was on the K-4 unit, cell 422. Id. at 118 – 119. Although he did not have a cellmate, he was able communicate with other prisoners directly next door to his own cell. Id. at 119. In the summer of 2021, he spoke to a prisoner who identified himself as Dread, later determined to be co-defendant Brinkley. Id. at 120. Co-defendant Brinkley was in the adjacent cell to Mr. Williams'. 424. Id. In the course of several conversations, the topic of a homicide on March 30, 2019, in Pottstown came up. Id. at 121. Co-defendant Brinkley asked Mr. Williams if he knew a guy named Naz and told him that Naz's real name was Keith. Id. at 122. Mr. Williams told co-defendant Brinkley that he was in Pottstown in August of 2020. Co-defendant Brinkley responded, "oh, the

22

guy was long gone by then," and he laughed about it. Id. Co-defendant Brinkley told Mr. Williams that he was the one charged with that homicide. Id. Co-defendant Brinkley confided in Mr. Williams, telling him specifics of the murder. Id. at 123. Co-defendant Brinkley stated that he and some friends were in a van and they drove past where the guy was and they saw him sitting in the car. Id. They parked the van somewhere away from cameras because he knew where in Pottstown where the cameras were. Id. He walked to the car the guy was sitting in, and walked up alongside of the car. Id. Co-defendant Brinkley said that the guy never saw it coming. Id. Co-defendant Brinkley described it as, he walked up on him, pop, pop, pop, pop, pop, pop. Id. at 124. He said he ran off and got rid of everything and wound up selling the strap[8] to his folks in Philadelphia. Id. Co-defendant Brinkley believed the gun would be used in a murder in Philadelphia, and if so, then the person who got caught with the gun in Philadelphia would be thought of as Naz's killer. Id.

Mr. Williams further testified that co-defendant Brinkley revealed his motive, telling him that Naz was an old guy, like 40-something, 20 years older than him, and was still out there hustling, and that his time was up. Id. at 126. Co-defendant Brinkley and his team wanted to take over his business and the guy was in the way. Id. He wasn't from Pottstown, he was from Philadelphia, and that annoyed co-defendant Brinkley. Id. Mr. Williams explained that by hustling, co-defendant Brinkley was referring to that Naz was

---

[8] Williams testified that the term "strap" is synonymous with "gun." (N.T., Trial by Jury – Day 6 of 8, 1/11/22, p. 125).

23

selling drugs. Id. at 127. Co-defendant Brinkley indicated that he was also selling drugs and that he was competing for business. Id. Co-defendant Brinkley had argued with Naz, and relayed that he was arrogant because he didn't believed that guys from Pottstown are tough like in Philadelphia. Id. at 129. Co-defendant Brinkley specifically stated, he "ain't going to let old dudes eating while he's starving." Id. at 127. Brinkley talked about the habeas corpus hearing and about Jamar Baird. Id. Brinkley was upset that he was going to testify against him when he was supposed to be part of his gang, BGB. Id. at 130.

Detective Heather Long was working in March of 2019 with Pottstown Police Department as a detective. Id. at 235 – 236. On March 30, 2019, Detective Long was called to assist with the investigation, to help conduct interviews on the night of the murder. Id. at 236. Days later she canvassed the area and later helped with cell phones. Id. During her time in Pottstown, she came into contact with individuals who had information about BGB. Id. at 236 – 237. She obtained information about BGB through numerous interviews, talking to community members, review of cell phone downloads in other investigations, reviewing social media, Instagram, Facebook, and Snapchat. Id. at 237.

Detective Long testified that she is familiar with BGB. Id. at 279. The detective explained that on July 6, 2017, Jordan Bud Scott was murdered in Norristown. Id. Speaking with people in the community, reviewing some of the videos, social media, various prior investigations, she is aware of people

24

who associate with BGB. Id. at 280. In particular, the detective described graffiti in Pottstown as it relates to BGB at Chestnut and North Washington Streets, where a tractor trailer had numerous spray painting tags on it, Fly High Bud, RIP Bud, LL23, Long Live Bud Savage, Free the Gang. Id. at 281 – 282. Detective Long knows that Jamar Baird, has a BGB tattoo on his neck. Id. at 282. Jamir Mitchell has a BGB tattoo on the back side of his hand. Id. She also knows that co-defendant Lee, co-defendant Brinkley, Tyshaun Harvey, Kelvin Harris, Jarid Majors, Ryan Fields, Nahmer Baird, Makael Bevins, Ahnile Fountain, and Elijah Davis are affiliated with BGB. Id. at 282 – 283. As to Goins, the detective testified that he is associated with several people in BGB, and that they went to Pottstown High School together and hung out under the title BFL, Brother for Life. Id. at 283 – 284.

Detective Long reviewed self-produced rap videos she came across on YouTube. Id. She came across these videos in reviewing social media, and it was brought to her attention by another officer in Pottstown, at which point she started additional intelligence gathering on the individuals and the gang in general in late 2018. Id. at 284 – 285. The detective testified that the video "Don't Understand" has references to BGB, and that individuals associated with BGB appear in the videos. Id. at 286. She testified that it was recorded sometime between July 2017 and May 2018. Id. at 287.

Detective Long testified that portions of the video are filmed at Chestnut and North Washington Street in Pottstown, that area with the trailer that had the BGB graffiti, another portion that is filmed inside 7 Beech Street,

25

the other half of the 206 Manatawny complex. Id. at 292 – 293. The tractor trailer location is also significant because the day prior to Jordan Scott's murder, he was involved in a shooting at that location. Id. at 293.

Detective Long testified using still photographs taken from the rap video. Id. at 294. The first picture depicted the start of the video with a picture of Jordan Scott. Id. at 294 – 295. In the background is the trailer with the BGB graffiti. Id. at 295. Co-defendant Lee and Jamir Mitchell were also depicted. Id. The main rap artists in the video, were co-defendant Lee and Jamir Mitchell. Id. In another still frame from the video was Steven Mitchell, who was murdered in 2014. Id. That was also co-defendant Lee's Instagram profile picture. Id. at 295 – 296. Another still image depicted Alexander Dot Scott, older half-brother of Jordan Scott, and Ryan Rizz Fields. Id. at 296. The next still image was of the participants rapping. Id. Present were co-defendant Lee, co-defendant Brinkley, Robert McCoy, Jamir Mitchell, and Charles Harris. Id. They were all wearing Medellin Materials clothing. Id. at 297. Another image shows co-defendants Lee and Brinkley shaking hands. Id.

An additional video, "Savage," featured individuals that are rapping including, co-defendant Brinkley, Jamar Baird, and Jamir Mitchell. Id. at 298 – 299. The detective identified an image of a medallion with a picture of Jordan Scott. Id. at 300. Another image was of co-defendant Brinkley holding a handgun. Id. at 301.

On cross-examination, Goins' defense counsel questioned Detective Long and asked her whether she was unequivocal that Goins was not a

member of BGB. Id. at 302. The detective answered that she found nothing, other than his association to Lee. Id. She also agreed that Goins was nowhere depicted in the rap videos she testified to. Id. at 302 – 303.

On the seventh day of trial, the Commonwealth presented the expert testimony of Lieutenant Erick Echevarria[9]. (N.T., Trial by Jury – Day 7 of 8, 1/12/22, p. 47). Lieutenant Echevarria worked for the Montgomery County Detective Bureau, currently the supervisor of the violent crime unit. Id. at 48. The lieutenant was accepted as an expert in gang structure and organization, drug trafficking, and jargon. Id. at 54 – 55.

Lieutenant Echevarria first described what makes a group of affiliated individuals a gang. Id. at 62 – 63. By reviewing social media, music videos, information from various police departments and correctional facilities, he and his investigators look for common bonds. Id. at 63. He explained that in Montgomery County there are primarily two locations with gang activity, Norristown and Pottstown, with Pottstown having more of a history of gang activity. Id. at 63 – 64. In general when a gang forms, members self-profess, they post, and they tag up until law enforcement gets involved. Then the members stop in order to distance themselves quickly from the gang. Id. at 64. The lieutenant testified that not every group of individuals that he has investigated, including numerous organizations involved in drug trafficking and

---

[9]    Defense counsel for Goins renewed his objection to Lieutenant Erick Echevarria's expert testimony, and requested a cautionary instruction. (N.T., Trial by Jury – Day 7 of 8, 1/12/22, p. 47, 55 - 59). This Court overruled the objection and denied the request for a cautionary instruction. Id. at 59.

other crimes, are gangs. Id. at 64. One of the things that sets a group of people apart from a gang, especially in Pottstown and Norristown, is that they attach that name to the criminal activity they're doing and expressing that through music videos, posting, tagging, and through word of mouth, and clothing. Id. at 65. This is done to bolster their image and spread fear. Id.

Lieutenant Echevarria became familiar with gang and drug jargon through his undercover work, i.e., wiretaps, reviewing social media, and phone downloads. Id. He has gathered gang intelligence to identify gang members and gang activity through local police departments, county and state level correctional facilities, interviewing informants, newly released prison gang members, music videos, and social media. Id. at 65 – 66.

Lieutenant Echevarria explained the gang activity in Pottstown, both predecessor gangs and BGB. Starting in 2015, his unit was tasked to investigate violence that was occurring within the Borough of Pottstown. Id. What he learned is how gangs evolve, where members stay the same or split up, but the name changes. Id. at 67. He explained that Pottstown gang activity started out as Brothers for Life ("BFL"). Id. at 67. In fact, co-defendant Lee has a BFL tattoo. Id. Goins and Jarid Majors were members of that gang. Id. BFL became Brothers From Another ("BFA"). Id. at 67. As his unit was investigating this gang activity, people were either BFA or Straight Cash Money Gang, ("SCMA"). Id. SCMG was represented through T-shirts and rap videos. Id. There was an investigation in these gangs and arrests were made. Thereafter, there was a void in regard to gang activity in Pottstown, until law enforcement began

28

to hear about 206 Manatawny Street. Id. Initially, it was believed that it was related to SCMG. Then in 2017, there was an influx in shootings in Pottstown when Jordan Scott was murdered. Id. Lieutenant Echevarria put his unit on alert, he contacted the correctional facilities and other agencies that this could be a triggering event for future gang activity. Id. at 68. After that, he explained the moniker BGB came. Id.

Lieutenant explained that a home-grown gangs or corner gangs are informal groups of people that are from a neighborhood. Id. They can either be for money or for turf, and they're joined together. Id. These home-grown gangs copy bigger gangs such as the Bloods, Crips, the Latin Kings and some of their ideologies. Id. In Montgomery County there is limited influence from national gangs, and much more home-grown street gangs. Id. The lieutenant further explained that what can happen with a home-grown gang is that the name can change and mutate, and if they find a reason to justify a name change and to be more aggressive and violent, they will do so. Id. at 68 – 69. Examples of events that could justify a name change could be a split from the founding member who created the name or law enforcement involvement. Id. at 69. For instance the SCMG, which was everywhere until there was an extensive investigation, and now the lieutenant testified that he rarely sees a mention of that gang. Id. Another triggering event for a name change could be a death or a murder. Id. Alexander Scott was an active member of SCMG, who is now in state prison for his gang activity, his younger brother was Jordan Scott. Id.

29

That is why when Jordan Scott was murdered he put the local police departments, correctional facilities, and his unit on alert. Id.

More specifically as to BGB, Lieutenant Echevarria explained how individuals are identified as being associated with BGB. A majority of the people associated with BGB had BGB hashtags[10], some sort of connection to BGB, or they were in videos in front of graffiti. Id. at 69 – 70. Also, even just going down a street in Pottstown, some people would yell "BGB." Id. at 70. The lieutenant searched for the hashtag BGB which turned up a lot of profiles and messages from the Pottstown area. Id. He further explained that individuals who are not in the gang might use the hashtag just to instill fear, because you are either with them or against them. Id. at 72 – 73. In his review of materials in this case that apply to BGB, there are other references and hashtags. Id. at 73. There were references to: Michael Jordan because of Jordan Scott's name, Long live Bud Savage, Bud Savage. Id.

In reviewing co-defendant Lee's Instagram records, Lieutenant Echevarria was able to determine that he was involved in drug trafficking. Id. For instance, co-defendant Lee's Instagram account posts stated, "the food is in" which he interpreted to mean that he was waiting for an arrival of illegal drugs. Id. at 75. He observed that "food" is code for heroin or fentanyl. Id. There were also references to drug trafficking in the rap videos that were

---

[10] It is a way to promote things on social media and the internet, legitimate and illegitimate. (N.T., Trial by Jury – Day 6 of 8, 1/12/22, p. 70, 71). Lieutenant Echevarria explained that it is the more modern equivalent of more traditional ways of promoting things such as graffiti. Id. So one way to promote your gang and your membership is to put a hashtag with that on social media. Id.

reviewed. Id. at 75 – 76. Lieutenant Echevarria was able to determine that co-defendant Lee was in a position of prestige in BGB. Id. at 76. To hold a position of prestige in a gang like this, the older members pass down the ideologies of the gang, such as they do not cooperate, loyalty, gang mantras, the way to live, how to drug traffic and other various illegal activities the gang is involved with. Id. at 77.

The lieutenant reviewed and testified to several of co-defendant Lee's Instagram posts, interpreting jargon. Id. He interpreted this jargon to reflect gang mentality, such as not to speak to law enforcement about the illegal activities. Id. at 78 - 79. As to co-defendant Brinkley's Instagram account named Long Live Bud Savage, referring to Jordan Scott, along with his posts, Lieutenant Echevarria determined that he is affiliated with BGB. Id. at 79, 81. The lieutenant interpreted many of these posts for the jury that exemplify gang mentality and ethos, such as "loyalty over royalty," meaning that you're loyal to the code, to the gang; "clip or get clipped," to the lieutenant meant that co-defendant was armed; "never turn ya back on ppl that had yours 100," meaning that if someone was loyal to you, then you are loyal to them. Id. at 80 - 82. Another post, "Loyalty first, money second," - - N word - - "Don't fuck up da motto 100," means loyalty to your gang, to your neighborhood, to your group, and then to make money is the next priority; so first is loyalty and second is to make money. Id. at 84. Another post, "free the gang," the lieutenant explained that this term comes up almost every time a group - - one of the group of people are incarcerated. Id.

31

Next, Lieutenant Echevarria discussed the significance of rap videos. Id. at 85. It was the lieutenant's expert opinion that BGB was not just a music group. Id. at 86. It is significant that the individuals that are depicted in the BGB videos are appearing in videos branded by BGB. Id. at 86 – 87. It spreads fear, it's telling the community that this is BGB. Id. at 86. Both of the videos talk about BGB itself. Id. at 87.

Lieutenant Echevarria decoded for the jury portions of the lyrics of the rap video "They Don't Understand." Id. at 89.

> It's Bud Gang Bitch. You don't understand. Nah, they
> don't understand. How they killed my man. That shit
> wasn't in the plan. You know me, off the wake up, I'm
> trying to make a band. What you need? I got grams of
> that white and the tan.

Id. at 90. He explained that they don't understand the death of Bud Scott and that the "wake-up" is when they wake up to try to make a band, a street term for a thousand dollars. Id. at 91. "White and tan" denotes cocaine and fentanyl. Id. He further explained that "[y]ou ain't a sucker free, homie. You took the stand, rat" is professing they are still loyal to the code, that they're still with the crew, with the gang. A "sucker" would be someone who is trying to be something they are not. Id. at 91 – 92. "You took the stand, rat," refers to someone who cooperated with law enforcement. Id. at 92.

> And the streets reach deep - - N word - - ain't no
> turnin' back, couple - - N words - - locked down that
> could turn into rants. I ain't stressing, but he tired
> and I'm wearing all black. Had to learn in reality I can't
> get Bud back. Every time I see an opp, it's going to be
> a blood bath. If you ain't tryin' to die, then you better
> fall back. I ain't aimin' fir the chest. I aim right at your

32

> head. If the cops ask me, man, I never saw that. No if
> the cops ask me, man, I never say that.

Id. The significance of "[t]he streets reach deep," refers to the fact that the arm

of the streets is long and that you can be retaliated. Id. at 92 – 93. "Ain't no

turnin' back," denotes that there's no turning back from that lifestyle. Id. at 93.

It could also mean that once you cooperate that you're not permitted back into

the group. "Couple" - - N word - - "locked down" expresses a concern that when

another individual that knows your illegal activity, is incarcerated by law

enforcement, that there's the risk of cooperation and that they are concerned

about their cooperation. Id. "I ain't stressing, but he tired, I'm wearin' all

black," is that they put on the clothes to conceal their identity, dark clothes at

night. Id. "I had to learn the reality I can't get Bud back," that's he's not coming

back from the dead. Id. at 93 – 94. "[E]very time I see an opp, it's going to be a

blood bath," "[o]pp" means opposition, someone that is against the gang. Id. at

94. The lieutenant testified that it is his opinion that if they see someone on the

other side or someone they perceive as an enemy, that there will be a blood

bath, that there'd be some sort of violence. Id.

Upon questioning of what could cause someone to be perceived as

an enemy, the lieutenant explained that it could stem from a murder of a

member. Id. Once it starts, any little thing triggers the violence. Id. "If you ain't

tryin' to die, then you better fall back," means don't oppose us. Id. "If you ain't

aimin' for the chest, I aim right at your head," means they are going to shoot

you in the head. Id. "If the cops ask me, man, I never saw that. Nah, the cops

ask me, I never saw that," warns not to cooperate with law enforcement, if you are interviewed by police, you didn't see anything. Id.

> In this game, you gotta cheat to make it out. Yep. I
> feed 'em in the streets by servin' food out the house.
> Pedro. I come with straight cash. I don't need no
> handouts. Cash. I started my own label, man, Medellin
> the brand now. From the streets.

Id. at 96. The lieutenant interpreted this to mean, that the "game" is life, and to get out of whatever predicament you are in, you have to do some sort of cheating. That cheating could be drug trafficking, it could some other crime, but cheating as in not normal work. Id. "Feed 'em" refers to heroin and fentanyl, and here it means illegal drugs. Id. "I come with straight cash, I don't need no handouts," the lieutenant believed it to be a reference to Lee's prior membership in Straight Cash Money Gang. Id. at 96 – 97. Co-defendant Lee is also referring to his clothing label that he started, Medellin. Id. at 97.

Lieutenant Echevarria opined that investigators did see an increase of Medellin T-shirts and wear in Pottstown. Id. Co-defendant Lee was the owner of that T-shirt company. He further explained that Medellin in from Columbia, one of the logos that it has is similar to the coca-cola logo, Pablo Escobar is sometimes referred to as the goat of drug-trafficking, the greatest of all time, and it's from Medellin, Columbia. Id. at 97 – 98. In one of the videos there is an acted-out drug transfer. Id. at 98. There's another one of the T-shirts with weight measurements on the back, and those measurements refer to amounts of drugs. That's on the back of co-defendant Lee's T-shirt. Id. So in the video all the BGB guys are wearing Medellin T-shirts, and so Medellin T-

shirts become associated with BGB so that they become interchangeable. Id. The lieutenant testified that since this murder and ensuing investigation, he hasn't seen Medellin clothing anymore. Id.

Next, the lieutenant testified regarding the rap video, "Savage." He explained that "We trappin," means selling drugs. Id. at 100. "None of my" – N word – "is lackin, we just pop out of the house, we blastin';" "[n]one of are lackin" refers to always being armed. Id. "Glizzy on me ain't lacking." Id. at 101. This refers to a firearm or specifically to a Glock, and the expression means that I have a gun on me. Id. "Cops come" - - N - - "run disappear like magic," according to the lieutenant is a gang mantra not to cooperate with police. If the police come, go, leave. Id. at 101 – 102. "All night we stackin'". "Stacking" means stacking money. Id. at 102. "Hoodie up, clips full, man's gone, shit tragic, fill 'em up, pull off, roll up, we laughin', VIP Little Bud." "Hoodie up" means to conceal yourself. Id. "Clip's full," the magazine is full. "Man's gone" could be the intended victim, or they could be referencing Jordan Scott Id. at 102 – 103. "Shit tragic" still talking about Jordan Scott. "Fill 'em up, "which would be the intended victim to full them with bullets." Id. at 103. And "pull off, roll up, we laughin'," after the shooting it's funny. Id.

Next, the Commonwealth asked Lieutenant Echevarria about 206 Manatawny Street, Apartment C2 location, and what significance it has to BGB. Id. He responded that that location was previously identified as a SCMG location, and then it became a location of interest to law enforcement prior to the murder of Jordan Scott and after his murder. Id. The lieutenant reviewed

35

several photographs of the interior of Apartment C2, and stated that they indicate that that location is a trap house. Id. at 104, 105 - 106. He explained that a trap house customarily does not have anyone living there so it can't be tied to any one person, and it's used for trafficking. It's known to customers. Id. His opinion was based on the fact that the photographs depicted limited furniture, and other indicators that it was used for selling drugs. Id. at 106.

The Commonwealth recalled Lieutenant Richard as its final witness. Arrest warrants were issued on July 25, 2019. Id. at 225. He was unable to take Goins into custody at that time, because Goins left the area. Id. Investigators spoke with family members, and tried to get Goins to turn himself in. Id. However, Goins did not turn himself in. Id. Eventually, Goins was located on September 19, 2019 in Upper Pottsgrove. Id. at 225 - 226.

At the conclusion of the trial, Goins was found guilty of first-degree murder and conspiracy. He proceeded directly to sentencing, at which time a life term imprisonment was imposed. A timely post-sentence motion was filed, and subsequently denied.

### ISSUES

This Court directed Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and on March 2, 2022, Appellant did so and raised the following issues set forth verbatim below:

> 1. The Defendant submits that the trial court made an error of law and abused its discretion in failing to grant Defendant's motion to sever as the Defendant was prejudiced by having his co-defendants tried

36

at the same time when there were several pieces of evidence admitted in front of the jury that would have been inadmissible against the Defendant if he had a separate trial, including but not limited to: co-defendant's Instagram and social media post, co-defendants' sworn grand jury testimony, co-defendant's confession, evidence of co-defendants' prior drug activities, gang activities and rap videos. In addition, all the specific bad acts evidence only applied to the Defendant's co-defendants and resulted in an unfair trial, no matter how many cautionary instructions the court made.

2. The Court made an error of law and abuse of discretion in allowing Lt. Erick Echeverria to testify as a Gang expert, when there was no testimony or evidence presented 1) that Defendant Goins was in the gang Bud Gang Bitch "BGB", 2) that Defendant Goins was involved in any gang activity in the last 10 to 15 years, 3) that Defendant Goins was involved in any drug activity or had any connection to the "trap" house at 206 Manatawny. Furthermore, the court made an error of law and abuse of discretion in failing to give a cautionary instruction as it related to Lt. Erick Echevarria testimony, in failing to advise the jury that none of the testimony of said witness could be used against Defendant Goins.

3. The Court made an error of law and abuse of discretion in allowing Lt. Eric[k] Echeverria to testify as a Gang expert witness, as Lt. Eric[k] Echevarria was not able to give any specific information as it related to the Bud Gang Bitch ("BGB") gang's hierarchy, organization structure, specific acts of gang or its affiliates, other than general information regarding gangs in general. Lt Eric[k]

37

Echeverria['s] entire testimony was speculative and conjecture as it related to BGB.

4. The Court made an error of law and abuse of discretion in allowing 404(b) evidence in trial where the Commonwealth failed to provide any actual notice of a 404(b) filing and the 404(b) evidence, including drug dealing, possession of weapons and drugs, social media posts was not related to Defendant Goins.

5. The Court made an error of law and abuse of discretion in allowing the playing of Rap Videos and publication of written lyrics associated with said videos as there very limited probative value, if any, that was greatly outweighed by their prejudicial effect and there was no evidence presented that Defendant Goins was involved in any way with said rap videos.

6. The Court made an error of law and abuse of discretion in denying Defendant's motion in limine to preclude evidence of gang affiliation.

7. The court made an error of law and abuse of discretion in denying Defendant's motion in limine to preclude evidence of rap videos and lyrics.

8. Defendant submits the Court made an error of law and abuse of discretion in giving the consciousness of guilt/flight instruction based upon the testimony elicited at trial. Defendant submits that there was no evidence of flight.

9. The jury's verdict was against the weight of the evidence because the weight of the evidence demonstrated a reasonable doubt as

38

to whether the Defendant had committed the crimes charged.

10. The Trial Court committed an error of law in denying Defendant's Post-Sentence Motion for judgment of acquittal based upon the fact that evidence introduced at trial was not legally sufficient to support the verdict because the evidence failed to establish each material element of the crimes charged and the commission thereof by the Defendant beyond a reasonable doubt; including the charge of Conspiracy and Murder in the First Degree.

<u>DISCUSSION</u>

I.    <u>Motion to Sever</u>

First on appeal, Goins contends that his motion to sever should have been granted because he was prejudiced when the following pieces of evidence were admitted in his co-defendant trial, when such evidence would not have been admissible against him in a separate trial: (1) co-defendant's Instagram and social media post, (2) co-defendants' sworn grand jury testimony, (3) co-defendant's confession, (4) evidence of co-defendants' prior drug activities, (5) gang activities and (6) rap videos.

On June 23, 2021 a Pre-Trial Motion Hearing was held in which defense counsel argued as he does on appeal that evidence that the Commonwealth sought to introduce would be inadmissible against Goins in a separate trial. (N.T., Pre-Trial Motions, 6/23/21, p. 115 – 116). Specifically, defense counsel asserted that Goins is not in any of the rap videos and he did not testify in front of the grand jury. <u>Id.</u> at 115. Defense counsel further argued

that it would be impossible for the jury to parse out the evidence, and that it would confuse the jury as it relates to Goins' involvement in the murder or conspiracy. Id. at 116.

The Commonwealth responded that the victim's murder was a single event, where all of the co-defendants are alleged to have participated in that single act. Id. at 118. According to the Commonwealth a majority of the evidence and witness testimony are applicable against all defendants. Id. Specifically, there is a lot of evidence that connects Goins to the conspiracy, and to the murder; such as testimony from multiple witnesses that puts Goins leaving the same location on Chestnut Street together just prior to the shooting, traveling in a black minivan together, the minivan was rented by Goins the day prior to the shooting; the black van is seen on surveillance twice in the area where the victim was shot and killed; and that just prior to the murder, Goins was identified by a witness as being in close proximity to the place the victim was shot. Id. at 118 – 119. Additionally, the Commonwealth pointed to the photo array from which Goins was identified, there is video surveillance at a gas station, a short time after the murder, of Goins getting out of the van in which co-defendant Lee is the driver. Id. at 119. Further, cell phone evidence shows Goins traveled to the area of the Uncut night club with his co-defendants. Id. at 119 – 120.

The Commonwealth argued that these co-defendants were associated, and that it would be arguing the inference that Goins was in the black van prior to the murder, he was in the area of the murder on foot as

40

identified by a witness, he was dressed in similar clothing as on the video and is of similar size and stature as the person in the surveillance video. The Commonwealth concluded that there was a lot of evidence connecting Goins to the conspiracy, and that a lot of the evidence overlaps. Id. at 120. The motion to sever was taken under advisement, and no ruling was made at that time.

On November 29, 2021, defense counsel renewed his motion to sever at another Pre-trial Motions Hearing. (N.T., Pre-trial Motions, 11/29/21, p. 35 - 36). In significant part he added that there was new evidence regarding Elijah Williams, turned over by the Commonwealth, that he is a jailhouse informant and will testify to a confession that co-defendant Brinkley gave. Id. at 36. The Commonwealth responded as to the witness Elijah Williams, the jury would be instructed to consider his testimony only as to co-defendant Brinkley, and that if there are specific references to the other co-defendants, the witness would be instructed not to provide those specific names, rather they would be replaced with expressions like "with his boys", "with his crew", "with others." Id. at 20 – 21.

At the conclusion of that Hearing, this Court denied the severance motion. Id. at 60.

The decision whether to sever trials of codefendants is within the sound discretion of the trial court, and we will not disturb this decision absent a manifest abuse of discretion. Commonwealth v. Wharton, 607 A.2d 710, 717 (Pa. 1992); see Pa.R.Crim.P. 582(A)(2) and 583. In cases where co-defendants are charged with conspiracy, severance is disfavored because

41

> [i]t would impair both the efficiency and the fairness of
> the criminal justice system to require ... that
> prosecutors bring separate proceedings, presenting the
> same evidence again and again, requiring victims and
> witnesses to repeat the inconvenience (and sometimes
> trauma) of testifying, and randomly favoring the last
> tried defendants who have the advantage of knowing
> the prosecution's case beforehand. Joint trials
> generally serve the interests of justice by avoiding
> inconsistent verdicts and enabling more accurate
> assessment of relative culpability.

Commonwealth v. Travers, 768 A.2d 845, 847 (Pa. 2001). However, our Pennsylvania Supreme Court has also recognized that there are potential difficulties arising from joint trials. A common problem arises in situations where evidence is admissible against one co-defendant but inadmissible against another. As a general matter, an instruction to the jury that it is to consider that evidence only with respect to the defendant against whom it is offered is sufficient to remove any potential prejudice:

> Ordinarily, a witness whose testimony is introduced at
> a joint trial is not considered to be a witness "against"
> a defendant if the jury is instructed to consider that
> testimony only against a co-defendant. This accords
> with the almost invariable assumption of the law that
> jurors follow their instructions....

Travers, supra.

In this case, severance was unwarranted because Goins and his co-defendants were charged with conspiracy and the vast majority of the evidence presented at trial was equally admissible against all of the co-

42

defendants. Out of the Commonwealth's twenty-eight witnesses, all but two[11] had testimony relevant to Goin's involvement in the murder. Therefore at a separate trial, the Commonwealth would be required to recall twenty-six of these witnesses. And although *portions* of those twenty-five witnesses' testimony might not have been relevant to Goins, such as that of Detective Long and Lieutenant Echevarria regarding gang related evidence, i.e., the rap videos, rap lyrics, social media accounts, and the introduction of co-defendants' Brinkley and Lee grand jury testimony introduced through the testimony of Lieutenant Richard, (N.T., Trial by Jury – Day 7 of 8, 1/12/22 pp. 192, 212), they would have had to be presented at a separate trial for Goins because they still had testimony directly relevant to Goins.

The main evidence that Goins took issue with is the gang related evidence; however, upon extensive cross-examination of Detective Long and Lieutenant Echevarria, Goins' defense counsel clearly brought out to the jury that he was not a member with BGB and that the gang-related evidence did not apply to him. Therefore, the jury was fully apprised that this evidence did not relate to Goins.

The charged crimes against all of the co-defendants arose from the same incident, much of the evidence presented at the eight-day trial related to Goins and his two co-defendants, and with effective cross-examination

---

[11] For instance the testimony of Elijah Williams, the jail house informant, did not relate to Goins since Mr. Williams testified to the conversations he had with Brinkley at Montgomery County Correctional Facility. (N.T., Trial by Jury – Day 6 of 8, 1/11/22, pp. Id. at 118 – 130). Further, the testimony of Joseph Interrante, the Major at the Montgomery County Correctional Facility, was not relevant to Goins, as he testified to the fact co-defendant Brinkley's cell was next to Mr. Williams. Id. at 194 – 200.

regarding gang affiliated evidence, the jury was aware that this evidence did not apply to Goins and could have easily been separate out by them. Accordingly, the motion to sever was properly denied.

II.    Gang Related Evidence

Five of Goins' ten issues on appeal, namely issues number two, three, five, six, and seven as set forth above, involve alleged errors regarding gang related evidence. In addressing these issues, it is vital to understand that the Commonwealth's theory of this case was that the co-defendants conspired to murder the victim, who was a rival drug dealer to the BGB gang. As evidence in support of this theory, the Commonwealth sought to introduce evidence that the co-defendants Brinkley and Lee were members of a home grown Pottstown gang, BGB, through witness testimony, rap videos and lyrics, social media posts, and through drug expert testimony of Lieutenant Erick Echevarria. The Commonwealth offered Lieutenant Echevarria's testimony to decode the various drug jargon contained in the rap videos and lyrics, and would testify as to how gangs operate, and gang related ethos of loyalty and respect. This gang related evidence was relevant to show the relationship among the parties, which goes to conspiracy. And although Goins was not a member of the BGB gang, Lieutenant Echevarria's testimony would show that he was affiliated with BGB members.

In addition, gang related evidence was relevant to show the motive to kill the victim, namely that he was a rival drug dealer. To this end,

44

Lieutenant Echevarria would provide expert testimony as to gang ethos of loyalty and the desire to have control of the streets.

At two Pre-Trial Motions Hearings on June 23, 2021 and November 29, 2021, this Court heard argument on several motions in *limine* regarding all of the gang related evidence in this case, including the expert testimony of Lieutenant Echevarria, the introduction of the rap videos and lyrics, social media accounts, and the 206 Manatawny Street, Apartment C2 location. These motions in *limine* were denied after extensive argument and consideration by this Court.

At the first Pre-Trial Motion Hearing on June 23, 2021, the Commonwealth stated that Lieutenant Echevarria is being offered for his background information on BGB throughout his time as a county detective as well as an expert in gangs generally. (N.T., Pre-Trial Motion, 6/23/21, p. 12). The Commonwealth represented that Lieutenant Echevarria would be able to provide information about gangs generally as well as knowledge specific to BGB. Id. at 18. The Commonwealth suggested that the jury would be aided by his testimony regard the background and history of BGB, how groups like that are formed, how they rely on each other, how they function, how they are structured, use a common home base at 206 Manatawny Street, Apartment C-2, and how these groups value and depend on the concept of loyalty and respect. Id. at 17. The Commonwealth asserted that this evidence was relevant to show an association which goes to the existence of a conspiracy. Id. at 14 – 15. Additionally, the Commonwealth argued that expert testimony was critical

45

to provide understanding as to motive and without this testimony the motive would not be clear. Id. at 15, 33. Under the Commonwealth's theory, BGB gang members want the victim gone, they wanted a strong hold in the Pottstown area in terms of street credibility as well as the drug and gun trade. Id. at 33. All this information would come in through the expert testimony, and that it is up to the jury to give weight to this testimony or not.

In response, Brinkley's defense counsel in part argued that BGB gang evidence is irrelevant. Id. at 34. He noted that the discovery that defense counsel have received was devoid of the critical connection between BGB's alleged drug dealing, the victim's drug dealing, and his drug dealing being the reason that BGB wanted to murder Robinson. Id. at 36. The matter was taken under advisement.

Further argument was conducted at a Pre-Trial Motions Hearing on November 29, 2021. At that time the Commonwealth argued that the expert testimony will tie all the circumstantial pieces of evidence together to show that even the slightest show of disrespect perceived or real could cause gang members to express that loyalty to one another, which is what was a motive for the murder. (N.T., Pre-Trial Motions, 11/29/21, p. 8). Witnesses would establish the victim was a drug dealer, that everyone knew he was a drug dealer, and that these co-defendants knew he was and wanted to take him out. Id. at 7. Through the testimony of Elijah Williams, there would be significant evidence regarding the motive for the murder, i.e., that these co-defendants were frustrated that individuals are coming from Philadelphia to Pottstown to

46

sell drugs, they didn't get the respect in Pottstown they deserved, and that is why they wanted to kill the victim; and the testimony of Lieutenant Echevarria who will review BGB affiliation, rap videos and lyrics, social media posts, drug jargon would put the whole picture together. Id. at 7 – 8. According to the Commonwealth, every piece of the puzzle would come together through this expert testimony. Id. at 8. He would be called to testify of how a gang operates and how these co-defendants' mentality operated as part of a gang and to contribute to the motive in this case. Id. at 51.

At the hearing, defense counsel for co-defendant Brinkley observed that Lieutenant Echevarria's eleven page expert report spends four pages reviewing his qualifications, two pages talking about the permutations of different gangs that ultimately led to the formation of BGB, three pages talks about the rap videos and the lyrics from the rap songs, one page talked about an unrelated investigation into 206 Manatawny Street, and finally one page talked about a straw purchase, subject to a separate motion in *limine*. Id. at 23. Defense counsel argued that what he did not see anywhere in those 11 pages was one single mention that Lieutenant Echevarria had actual knowledge of a conflict between BGB and the victim. Id. at 23 – 24. He further argued that the evidence regarding rap videos and the rap lyrics falls under the same argument. Id. at 27. The Court deferred ruling for further review. Id. at 60.

After considerable deliberation, this Court issued orders denying the co-defendants' motions in *limine*, and granting the admission of evidence

47

on December 20, 2021. The denial of a motion in *limine*, granting the admission of evidence is reviewed by our appellate courts for an abuse of discretion. Commonwealth v. Mangel, 181 A.3d 1154, 1158 (Pa. Super. 2018).

It is well settled that the "[a]dmission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." Commonwealth v. Tyson, 119 A.3d 353, 357 (Pa.Super. 2015) (*en banc*) (internal citation and quotation marks omitted); see also Commonwealth v. Hoover, 107 A.3d 723, 729 (Pa. 2014) (noting that an appellate court applies an evidentiary abuse of discretion standard when reviewing the denial of a motion in *limine*). "Accordingly, a ruling admitting evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous." Commonwealth v. Huggins, 68 A.3d 962, 966 (Pa.Super. 2013) (internal citations and quotation marks omitted).

Relevance is the threshold for admissibility of evidence. Pennsylvania Rule of Evidence 401 provides that evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact. Pa.R.E. 401. All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible. Pa.R.E. 402. The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following:

48

unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.' Pa.R.E. 403.

Rule 404(b) prohibits evidence of a defendant's prior bad acts "to prove a person's character" or demonstrate "that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, prior bad acts evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). "In a criminal case, this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Id. "Unfair prejudice means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially."

A. Gang Expert Testimony by Lieutenant Erick Echeverria as to Goins and No Cautionary Instruction

In Goins' issue number two, Goins contends that this Court abused its discretion in permitting Lieutenant Echeverria to testify as a gang expert, when there was no evidence that Goins was in the gang BGB, that he was involved in any gang activity, that he was involved in any drug activity or had any connection to the "trap" house at 206 Manatawny. Goins further alleges that this Court erred in failing to give a cautionary instruction as it related to Lieutenant Echeverria's testimony, advising the jury that none of his testimony could be used against him.

49

In this issue, Goins is seemingly re-litigating his motion to sever. His current appellate argument focuses solely on Lieutenant Echevarria's expert opinion as it related to him, i.e., that the lieutenant's opinion should have been excluded because there was no evidence that he was a part of BGB and that his testimony was irrelevant to him. This the same reasoning that Goins asserted in his motion to sever, that he should have not been tried at a co-defendant trial because there was admissible evidence as to co-defendants Brinley and Lee, but not to him. This current argument is just another variation of his sever argument.

However, addressing more specifically the issue of Lieutenant Echevarria's testimony, it was crucial to both the existence of the alleged conspiracy and to the motive. As a drug expert he testified about gangs in general and specifically about BGB. He opined on the values that are important to gangs such as loyalty, respect, and instilling fear. As to BGB, he explained how this Pottstown gang arose out of predecessor Pottstown gangs, its various members, and decoded gang and drug jargon in the BGB videos and lyrics exemplifying the gang ethos. All of his testimony went to association of the co-defendants, whether BGB members as in the case of co-defendants Brinkley and Lee or simply affiliated with BGB members, as in the case of Goins. As to Goins, the lieutenant explained that he was part of a predecessor gang, BFL, along with co-defendant Lee, and that BFL later mutated to become BGB. Accordingly, the motion in *limine* requesting exclusion of this expert testimony was properly denied.

50

Although defense counsel did request a cautionary instruction as it related to the expert opinion and Goins, it was properly denied. Prior to Lieutenant Echevarria testifying, defense counsel made his request for a cautionary instruction, arguing that there was nothing in Lieutenant Echevarria's report linking Goins to being a member of BGB, involved in any gang, in any rap videos, drug activity, or linked to 206 Manatawny Street. (N.T., Trial by Jury- Day 7 of 8, 1/12/22, pp. 55 – 56). The Commonwealth responded that the export report does reference that BGB is a home-grown gang and is a development from prior gangs. Id. at 56. It also sets forth that Goins was a member of a predecessor gang, BFL, along with Mr. Majors and co-defendant Lee. Id. The Commonwealth argued that although Goins doesn't self-identify with BGB, he is a close trusted associate of co-defendant Lee's because of their prior gang association. Id. at 57, 58. The request for a cautionary instruction was denied, and at that time this Court stated that defense counsel's argument that Goins is not related to BGB is for cross-examination and closing argument. Id. at 60.

The denial of a cautionary instruction was proper. Defense counsel wanted a cautionary instruction that Lieutenant Echevarria's expert testimony should not be considered against Goins. However, while it is true that Lieutenant Echevarria did not testify that Goins was a member of BGB, he did testify that Goins was a member of a predecessor gang and through that he was affiliated with co-defendant Lee. More specifically he stated that starting in 2015, his unit was tasked to investigate violence that was occurring within the

51

Borough of Pottstown. Id. at 66. During that time, his unit identified two warring gang factions. Id. Within six months, they identified 22 various shootings. Id. at 66 – 67. What he learned during this time about gangs in Pottstown is how gangs evolve, where members stay the same or split up, but the name changes. Id. at 67. He explained that it started out as Brothers for Life, and co-defendant Lee has that tattoo. Id. Goins and Jarid Majors were members of that gang. Id. Therefore, because the expert testimony was relevant in part to Goins he was not entitled to a cautionary instruction that this testimony cannot be considered against him.

Additionally, defense counsel extensively cross-examined this witness and clearly brought out the fact that Goins was not a member of BGB. Id. at 128 – 147. First, Lieutenant Echevarria acknowledged that Detective Long specifically said that Goins was not a member of BGB. Id. at 132. Detective Echevarria also stated that Goins is not a member of BGB. Id. 132 – 133, 141, 144. The detective testified that he did not find any videos of Goins proclaiming to be a member of BGB and that there were no hashtag references by Goins to BGB. Id. at 133. Goins was in none of the rap videos identified by law enforcement as relating to BGB, Goins was not mentioned in any of the videos, and there was no link between Goins and these videos. Id. at 138 – 139. Defense counsel also questioned the lieutenant about the lack of affiliation between Goins and 206 Mantawny Street. Id. at 140, 142 - 143.

B. <u>Gang Expert Testimony by Lieutenant Erick Echeverria Not Specific to BGB</u>

In Goins' third enumerated issues as set forth above, he contends that this Court erred in permitting Lieutenant Echevarria to testify as a gang expert witness because he was not able to give any specific information about BGB as to the gang's hierarchy, organization structure, specific acts of the gang or its affiliates, other than general information regarding gangs in general. Appellant argues that this rendered his testimony speculative and conjecture as it related to BGB.

On December 20, 2021, this Court entered an order finding Lieutenant Echevarria's expert testimony to be admissible, and denying defense counsel's motion in *limine* to preclude his testimony.

Now on appeal, the issue that is asserted claims that his testimony should have been rendered inadmissible because it only provided general information about gangs and none specific to BGB; therefore, it was speculative in nature. However, this theory as a basis to exclude the expert testimony is novel. It was never raised before this appeal by Goins' defense counsel or any of the co-defendants' counsel, which he could have adopted.

All defense counsel were presented with his expert report by the time of the second Pre-Trial Motions Hearing and understood the substance of his proffered testimony; however this issue was never raised. This Court respectfully requests that this issue be deemed waived. "A theory of error different from that presented to the trial jurist is waived on appeal, even if both

53

theories support the same basic allegation of error which gives rise to the claim for relief." Commonwealth v. Gordon, 528 A.2d 631, 638 (Pa.Super. 1987)

Even if this issue was properly preserved it lacks merit. The lieutenant's trial testimony is replete with specific information as to BGB. He described the predecessor gangs, how this specific gang formed and why, and the ethos of BGB members as expressed through BGB related rap videos and lyrics.

### C. Rap Videos and Rap Lyrics

In issue number five, Goins alleges that this Court made an error of law and abused its discretion in allowing the playing of rap videos and publication of written lyrics associated with said videos as there very limited probative value, if any, that was greatly outweighed by their prejudicial effect and there was no evidence presented that Goins was involved in any way with said rap videos. In Goins' seventh enumerated issue, he claims that this Court abused its discretion in denying his motion in *limine* to preclude evidence of rap videos and lyrics. These issues will be addressed simultaneously.

The Commonwealth sought to introduce the rap videos and lyrics in order to establish conspiracy and motive. The Commonwealth argued that the rap videos demonstrate gang activity and association. This goes to the conspiracy, the conspiracy to commit murder, which all of the co-defendants were charged with. (N.T., Pre-Trial Motions, 6/23/21, p. 12 - 13). The Commonwealth argued that there is only one shooter, and the remaining co-defendants assisted in committing the murder. Id. at 45. It would be their

54

affiliation through the gang that is relevant to show this conspiracy. Id. More specifically, the Commonwealth argued that the rap videos are associated with the BGB, with numerous BGB tags and graffiti, and are filmed in locations significant to BGB, including 206 Mantawny Street. Id. at 16. There are references to always carrying firearms and there are specific references to not cooperating with police. Id. at 56. The Commonwealth told this Court that other members of BGB would be called to testify, Jamar Baird and Jarid Majors. Id. at 30. There would be a drug expert to testify that you are only going to have close associates appearing in these sorts of videos. Id. at 43.

In addition, this gang association explains the motive of the murder. Id. at 13, 14 – 15. The Commonwealth noted that there is a significant emphasis in the rap videos on the importance of drug dealing and making money, with many drug dealing references. Id. at 43. This goes to motive. Id. The Commonwealth stated that there would be testimony from a jargon expert about those drug dealing references. Id.

Defense counsel argued that Goins was in no way associated with the rap videos. Id. at 25, 51. Additionally, he argued that the nexus between the rap videos and the murder is lacking. Id. at 53. The matter was taken under advisement.

Further argument on the matter was held on November 29, 2021. At that time, the Commonwealth asserted that had witness testimony establishing that the victim was a drug dealer. That it was well-known all across Pottstown, that the co-defendants knew this, and that they wanted to

55

take him out. (N.T., Pre-Trial Motions, 11/29/21, p. 7). The Commonwealth stated that it will establish this circumstantially through multiple ways. Id. The Commonwealth pointed to testimony of Elijah Williams who will provide significant information regarding the motive to the murder, that these co-defendants were frustrated, that individuals from Philadelphia were coming to Pottstown to sell drugs, and that they didn't get the respect in Pottstown that they deserved, which goes to the motive to murder Keith Robinson. Id. at 7 – 8. The Commonwealth reiterated that Lieutenant Echevarria will testify as a gang expert, whose testimony will tie all these circumstantial pieces of evidence together. Id. at 8. The Commonwealth argued that this is a conspiracy case, and it would establish that these co-defendants worked together to eliminate the victim, and that Lieutenant Echevarria's testimony ties all of the evidence together. Id. At the conclusion of the hearing, the Court did not rule on the issue so as to take further time to review. Id. at 60.

On December 20, 2021, an order was issued denying the motion in *limine* to exclude the rap videos. An additional order was issued permitting the audio and video evidence of the rap videos to be admissible at trial.

On appeal, Appellant contends that the denial of the motion in *limine* was in error and an abuse of discretion. For the reasons that follow this Court respectfully argues that its ruling should be upheld.

The rap videos and lyrics were properly admitted to show that there was an association among the co-defendants, i.e., that they belonged to a gang, BGB, and that as a gang there were a set of ethos, as testified to by gang

56

expert Lieutenant Echevarria, which in gave rise to their collective motive, their conspiratorial motive, to murder the victim. In other words, the rap videos and lyrics was evidence of gang activity, and such gang activity was relevant to show a conspiracy existed. It is well-established that evidence of a defendant's gang activity is admissible to establish a conspiracy. See Commonwealth v. Gwaltney, 442 A.2d 236, 241 (Pa. 1982) ("evidence of the gang activity is highly probative of whether a conspiracy existed"); see also, Commonwealth v. Flamer, 53 A.3d 82, 89 (Pa.Super. 2012) (rap lyrics should have been admitted where lyrics about people "keeping their mouths shut," sending friends to kill for him, and "popping shells" in people that "run their mouth" had a tendency to show a conspiratorial agreement).

In addition, the gang activity evidence was relevant to establish a motive for the murder. This evidence when pieced together with other testimony and evidence, including the drug expert testimony, presented by the Commonwealth established that co-defendants viewed the victim as a rival drug dealer. See, Commonwealth v. Ramos, 532 A.2d 22, 23-24 (Pa. Super. 1987) (properly admitting evidence of gang activity and drug dealing to explain motive and relationship). Evidence of gang affiliation and gang ethos was relevant to show that these co-defendants had the motive, intent, and plan to conspire in the murder. Therefore, this gang-related evidence in the form of rap videos and lyrics was properly admitted at trial. And although Goins was not a member of BGB, he was closely associated with members of that gang, and had been a gang member of a predecessor gang, BFL.

57

As to whether the playing of the videos for the jury and the publication of the lyrics was proper, this issue is waived. Presumably the inclusion of the rap videos and rap lyrics would include the playing of videos for the jury as well as the publication of the lyrics. None of the defense counsel raised this as an issue at any time prior to trial or at trial. The argument that defense counsel focused on was the general argument that this evidence should be excluded. It was never argued that if this evidence is deemed admissible then the videos should not be played and that the lyrics not be transcribed. Accordingly, this argument is waived on appeal.

### D. Motion in *Limine* as to Gang Affiliation

Appellant's sixth issue on appeal asserts that this Court abused its discretion in denying his motion in *limine* to preclude evidence of gang affiliation. Gang affiliation evidence was comprised of several components. It was introduced through expert witness testimony. The expert testimony analyzed BGB rap videos and rap lyrics, and BGB related social media accounts. As explained earlier in this opinion, gang affiliation was properly admitted and relevant to show association among the co-defendants to establish conspiracy and motive for the murder.

### III. Notice of 404(b) Evidence

Next on appeal, Goins claims that this Court abused its discretion in permitting Rule 404 (b) evidence at trial where the Commonwealth failed to provide any actual notice of a 404(b) filing and the 404(b) evidence, including drug dealing, possession of weapons and drugs, social media posts that were not related to Goins.

At the June 23, 2021, Pre-Trial Motions Hearing, the Commonwealth addressed the Court stating that the co-defendants had filed motions in *limine* to exclude forms of evidence related to gang affiliation, specifically to a local Pottstown gang referred to as BGB. (N.T., Pre-Trial Motions, 6/23/21, 10). The Commonwealth contemplated admitting witness testimony to establish the relationships among the co-defendants; the co-defendants' association with BGB, including rap videos and lyrics referencing BGB; social media posts related to BGB, and expert testimony of Lieutenant Echevarria related to gang jargon. Id. The Commonwealth detailed that it intended to call Detective Heather Long of the Montgomery County Detective Bureau and Lieutenant Erick Echevarria, who would testify as to social media posts with "#BGB", references to Jordan Scott who is the murdered individual who inspired the creation of BGB, rap videos and rap lyrics referencing BGB. Id. at 11 – 13. The Commonwealth would further present the testimony of Jamar Baird and Jarid Majors, both who testified at the grand jury or gave statements, that were members of BGB. Id. at 30.

Defense counsel for co-defendant Brinkley asserted on behalf of all of the co-defendants that they received no 404(b) motions from the Commonwealth in this case. Id. at 19. He stated that if the Commonwealth wished to introduce evidence of gang affiliation, activity, or membership among any of the co-defendants, that those are prior bad acts, which requires a Rule 404(b) motion. Id. Defense counsel continued that all of the co-defendants' motions in *limine* to preclude such evidence was anticipatory in nature. Id. Defense counsel acknowledged that the Commonwealth raised the relevant issues of expert testimony of Lieutenant Erick Echevarria,[12] social

---

[12]     The notes of testimony refer to Lieutenant Erick Echevarria as Detective Eric Echevarria. This Court will refer to this witness with his proper title and correct spelling of his name.

media posts, rap videos and lyrics, and BGB membership. Id. at 19 – 21. However, it was asserted that based upon the offer of proof the Commonwealth provided earlier at the hearing, counsel are forced to speculate as to what particular evidence that intend to introduce. Id. at 22. Goins' defense counsel joined in on the argument. Id. at 24. He claimed that they are at a disadvantage because without the normal offer of proof in writing, they cannot be put on notice to adequately argue against excluding the evidence under Rule 404(b). Id. at 24 – 25. Goins' defense counsel further brought to the Court's attention that the rap videos and social media posts with gang affiliations were in no way connected to Goins. Id. at 25. He said that that is related to his motion to sever. Id.

The Commonwealth responded that under Rule 404(b)(3), the notice that is required in a criminal case is that the prosecutor must provide reasonable notice in advance of trial, or during trial if the Court excuses pretrial notice on good cause shown, of the general nature of any type of evidence the prosecutor intends to introduce at trial. Id. at 30. The Commonwealth's position was that this requirement was met when in its responses to the co-defendants' motions in *limine* it stated its intention to admit evidence related to gang activity. Therein the Commonwealth stated the types of evidence it was seeking to admit, the basis for that evidence under Rule 404(b), and the case law in support of its admission. Id.

Under the Pennsylvania Rules of Criminal Procedure, Rule 404(b)(3) [13], in effect at the time this matter was adjudicated, "...the prosecutor

---

[13]     Pa.R.Crim.P. 404 was amended on December 2, 2021, and became effective as of April 1, 2022. Rule 404(b)(3) was amended to read as follows:

> (3) *Notice in a Criminal Case.* In a criminal case the prosecutor
> must provide reasonable written notice in advance of trial so that
> the defendant has a fair opportunity to meet it, or during trial if

must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial." See, Rule 404(b)(3). "The purpose of this rule is to prevent unfair surprise, and to give the defendant reasonable time to prepare an objection to, or ready a rebuttal for, such evidence. However, there was then no requirement that the "notice" must be formally given or be in writing in order for the evidence to be admissible." Commonwealth v. Lynch, 57 A.3d 120, 125–26 (Pa.Super. 2012) (internal citations and quotation marks omitted). Our courts have held that sufficient notice exists where the prior bad acts evidence was discussed during a preliminary hearing or where the defense received the evidence in discovery. Commonwealth v. Stallworth, 781 A.2d 110, 118 n.2 (Pa. 2001); Commonwealth v. Mawhinney, 915 A.2d 107, 110 (Pa.Super. 2006).

In this case, although the Commonwealth did not file a written motion, the Commonwealth as noted by defense counsel presented extensive discovery (N.T., Pre-Trial Motions, 6/23/21, p. 11) and the Commonwealth filed responses to co-defendants' anticipatory motions in *limine* which was based upon the discovery that was provided. In those responses the Commonwealth detailed the gang related evidence it intended to introduce. Further, at the Pre-

---

the court excuses pretrial notice on good cause shown, of the
specific nature, permitted use, and reasoning for the use of any
such evidence the prosecutor intends to introduce at trial.

See, Pa.R.E. 404. The version relied on in this appeal, which expired on March 31, 2022, is the version that was in effect at the time that the pre-trial motions were adjudicated and at the time of trial.

61

Trial Motions Hearing on June 23, 2021, the Commonwealth further fleshed out what evidence they were seeking to be admitted. This evidence was discussed extensively at this hearing and it was further discussed at another Pre-Trial Motions hearing on November 29, 2021. There can be no claim of surprise or that there was not a sufficient amount of time to prepare an objection to this evidence. This claim must fail.

IV.     Jury Instructions – Consciousness of Guilt/Flight

In issue number eight as set forth about, Goins claims that it was an error of this Court and an abuse of discretion in charging the jury with the consciousness of guilt/flight jury instruction.

After the jury was excused at the end of day seven of the trial, this Court notified counsel of its intention of providing the jury with the consciousness of guilt/flight jury instruction. (N.T., Trial by Jury – Day 7 of 8, 1/11/22, p. 361). Goins' defense counsel objected, arguing that there was no evidence of fleeing. Id. at 362. The objection was overruled, and this Court stated that there was testimony that investigators went to Goins' mother's house repeatedly, asking to try to have Goins turn himself in; therefore it could be argued that Goins was avoiding the police. Id. at 362 – 363. This Court did provide the standard jury instruction on consciousness of guilt/flight. (N.T., Trial by Jury – Day 8 of 8, 1/12/22, p. 227).

In examining an appellant's challenge to a jury instruction on flight as consciousness of guilt, our Supreme Court has stated:

62

> A jury instruction is proper if supported by the evidence of record. [...W]hen a person commits a crime, knows that he is wanted therefor, and flees or conceals himself, such conduct is evidence of consciousness of guilt, and may form the basis [of a conviction] in connection with other proof from which guilt may be inferred.

Commonwealth v. Clark, 961 A.2d 80, 92 (Pa. 2008) (internal citations omitted). An instruction on flight/consciousness of guilt is appropriate where the evidence existed that defendant committed a crime, knew he was wanted, and fled or concealed himself. Commonwealth v. Lukowich, 875 A.2d 1169, 1173 (Pa.Super. 2005) (citations omitted).

In this case, Detective Richard testified that the arrest warrant for Goins was issued on July 25, 2019, and that he was unable to take him into custody at that time because Goins left the area. Investigators spoke with family members, and tried to get Goins to turn himself in, which he did not do. Eventually Goins was located on September 19, 2019 in Upper Pottsgrove. From this evidence it can be inferred that Goins knew he was wanted in connection with this murder, but concealed his location until the time law enforcement was able to locate him.

V.     Weight of the Evidence

In Goins' issue number nine, he asserts that "[t]he jury's verdict was against the weight of the evidence because the weight of the evidence demonstrated a reasonable doubt as to whether the Defendant had committed the crimes charged." See, Concise Statement of Matters (sic) Complained of on Appeal, filed 3/2/22.

63

In this case, Goins was convicted of first-degree murder and criminal conspiracy. Goins' 1925(b) statement, merely alleges that these convictions were against the weight of the evidence. Given the lack of any specificity as to which conviction and why that conviction was against the weight of the evidence, this Court finds a waiver of this issue. To preserve a challenge to either the sufficiency or weight of the evidence on appeal, an appellant's Rule 1925(b) concise statement must state with specificity the elements or verdicts for which the appellant alleges that the evidence was insufficient or against the weight of the evidence. See Commonwealth v. Freeman, 128 A.3d 1231, 1248-49 (Pa.Super. 2015) (finding waiver of appellant's sufficiency and weight challenges where the Pa.R.A.P. 1925 statement was too vague to permit the court to identify (1) which crimes, or the elements of any crimes, that the Commonwealth allegedly failed to prove beyond a reasonable doubt; or (2) which verdicts were contrary to the weight of the evidence, and the specific reasons why the verdicts were contrary to the weight of the evidence); see also, Commonwealth v. Reeves, 907 A.2d 1, 2 (Pa.Super. 2006) ("If a Rule 1925(b) statement is too vague, the trial judge may find waiver and disregard any argument.") citing, inter alia, Commonwealth v. Lemon, 804 A.2d 34, 37 (Pa.Super. 2002) (statements in Rule 1925(b) that "the verdict of the jury was against the evidence," "the verdict of the jury was against the weight of the evidence," and "the verdict was against the law" were too vague to permit adequate review); and Commonwealth v. Seibert, 799 A.2d 54, 62 (Pa.Super. 2002) (Rule 1925(b) statement that "the verdict of the jury

64

was against the weight of the credible evidence as to all of the charges" was too vague to permit appellate review).

Further, looking at Goins' Post-Sentence Motion is of no help, where it is also vaguely alleged that "Defendant submits the jury's verdict was against the weight of the evidence. Specifically, the Defendant contends the weight of the evidence presented demonstrated a reasonable doubt to whether the Defendant had committed the cringes charged" See, Post-Sentence Motion, filed on 1/21/22, ¶¶14, 15. Accordingly, without more specificity this Court is unable to address this issue on appeal, and is therefore waived.

IX.     Judgment of Acquittal

Finally, Goins contends that this "Court committed an error of law in denying Defendant's Post-Sentence Motion for judgment of acquittal based upon the fact that evidence introduced at trial was not legally sufficient to support the verdict because the evidence failed to establish each material element of the crimes charged and the commission thereof by the Defendant beyond a reasonable doubt; including the charge of Conspiracy and Murder in the First Degree."

A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge." Commonwealth v. Emanuel, 86 A.3d 892, 894 (Pa. Super. 2014). Again, this Court is constrained to find that Goins has waived his sufficiency claim. "In order to preserve a challenge to the sufficiency of the evidence on

65

appeal, an appellant's Rule 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient." Commonwealth v. Stiles, 143 A.3d 968, 982 (Pa.Super. 2016 (quoting Commonwealth v. Garland, 63 A.3d 339, 344 (Pa.Super. 2013)). "Such specificity is of particular importance in cases where, as here, [Appellant] was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt." Commonwealth v. Ellison, 213 A.3d 312, 321 (Pa.Super. 2019). "Therefore, when an appellant's [Rule] 1925(b) statement fails to specify the element or elements upon which the evidence was insufficient[,] ... the sufficiency issue is waived on appeal." Id.

Here, Goins has failed to either articulate the specific elements of any crime which he deems the evidence presented at trial failed to sufficiently establish. In addition, Appellant's Post-Sentence Motion is similarly devoid of any specificity. See, Concise Statement of Matters (*sic*) Complained of on Appeal, filed 1/21/22, ¶¶ 16, 17. Therefore, this issue is waived.

## CONCLUSION

Based upon the foregoing analysis, Goins' judgment of sentence entered on January 13, 2022, should be affirmed.

BY THE COURT:

WILLIAM R. CARPENTER        J.
COURT OF COMMON PLEAS
MONTGOMERY COUNTY
PENNSYLVANIA
38TH JUDICIAL DISTRICT

**Copies sent on May 13, 2022**
**By Electronic Mail to:**

Robert Falin, Esquire, Deputy District Attorney, Chief of Appellate Division;
RFalin@montcopa.org

Gregory P. DiPippo, Esquire; gdipippo@pmrbm.com

Denise S. Vicario, Esquire, Executive Director; opinions@montgomerybar.org

Paul DAnnunzio; PDAnnunzio@alm.com

**Copies sent on May 13, 2022**
**By First Class Mail to:**

Derrick Goins #QN7308
SCI Camp Hill
P.O. Box 8837
2500 Lisburn Road
Camp Hill, PA 17001

Judicial Assistant

67